1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  WAYNE SNODGRASS, State Bar #148137
   VINCE CHHABRIA, State Bar #208557
3  FRANCESCA GESSNER, State Bar #247553
   Deputy City Attorneys
4  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
5  San Francisco, California 94102-5408
   Telephone:    (415) 554-4672
6  Facsimile:    (415) 554-4699
   E-Mail:        francesca.gessner@sfgov.org
7

8  Attorneys for Defendants
   TAXI COMMISSION and
9  CITY AND COUNTY OF SAN FRANCISCO

10

11

12                      UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14  WILLIAM SLONE and MICHAEL              Case No. C07-3335 JSW
    MERRITHEW,
15                                          **DEFENDANTS' NOTICE OF
            Plaintiffs,                      MOTION, MOTION AND
16                                          MEMORANDUM OF POINTS AND
        vs.                                  AUTHORITIES IN SUPPORT OF
17                                          MOTION FOR SUMMARY
    TAXI COMMISSION, CITY AND               JUDGMENT AND/OR PARTIAL
18  COUNTY OF SAN FRANCISCO,               SUMMARY JUDGMENT**
    Executive Director Heidi Machen; CITY
19  AND COUNTY OF SAN FRANCISCO, a         Hearing Date:      April 8, 2008
    California public entity,               Time:              9:00 a.m.
20                                          Place:             Ctrm. 2, 17th Floor
            Defendants
21  .

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

NOTICE OF MOTION ................................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 2

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 3

INTRODUCTION .......................................................................................................... 3

BACKGROUND ............................................................................................................ 5

      A.     Proposition K and the Driving Requirement ................................. 5

      B.     The Creation of the Taxi Commission and Its 2002 ADA Resolutions ...... 7

            1.     Taxi Commission Resolution No. 2002-14 ..................................... 7

            2.     2002 California Court of Appeals Decision .................................... 8

            3.     Taxi Commission Resolution No. 2002-93 ..................................... 9

      C.     The Voters' 2003 Rejection of Proposition N ................................. 9

      D.     Taxi Commission Resolution No. 2006-28 .............................................. 10

      E.     Slone and Merrithew's Requests for Waivers of the Driving Requirement ........................................................................................ 11

      F.     The Lawsuit ................................................................................... 12

LEGAL STANDARDS ................................................................................................. 13

DISCUSSION ............................................................................................................... 13

   I.     DRIVING IS AN ESSENTIAL ELIGIBILITY REQUIREMENT OF THE CITY'S PROGRAM, WAIVER OF WHICH IS NOT A REASONABLE MODIFICATION BECAUSE IT WOULD FUNDAMENTALLY ALTER THE PROGRAM .......................................................................................... 13

      A.     Driving Is An Essential Eligibility Requirement Of The City's Taxi Medallion Licensing Program Because It is Necessary To Accomplish Its Purpose ....................................................................................... 15

      B.     Plaintiffs' Requested Modification Is Not Reasonable Because It Would Fundamentally Alter the Nature of the City's Medallion Program ........... 18

            1.     Waiver of An Essential Eligibility Requirement Is Unreasonable As A Matter of Law ..................................................................... 19

            2.     Plaintiffs' Requested Waiver of the Driving Requirement Would Fundamentally Alter the Nature of the City's Taxi Program ......... 22

CONCLUSION ............................................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*
      477 U.S. 242 (1986)...............................................................................13

*Aughe v. Shalala*
      885 F. Supp. 1428 (W.D. Wash. 1995).....................................4, 14, 15, 16, 18, 20

*Castellano v. New York*
      946 F. Supp. 249 (S.D.N.Y. 1996) .............................................................19, 21

*Cole v. Nat'l Collegiate Athletic Ass'n*
      120 F. Supp. 2d 1060 (N.D. Ga. 2000)..............................................15, 16, 20, 21, 22

*Easly v. Snider*
      36 F.3d 297 (3rd Cir. 1994) .............................................................16, 18, 23, 24

*Freeman v. Arpaio*
      125 F.3d 732 (9th Cir. 1997) ...............................................................13

*Jones v. City of Monroe*
      341 F.3d 474 (6th Cir. 2003) .............................................................22, 23, 24

*Matthews v. Nat'l Collegiate Athletic Ass'n*
      79 F. Supp. 2d 1199 (E.D. Wash. 1999).....................................................16, 21, 22

*McPherson v. Michigan High School Athletic Ass'n, Inc.*
      119 F.3d 453 (6th Cir. 1997) ...............................................................15

*Myers v. Hose*
      50 F.3d 278 (4th Cir. 1995) ...............................................................22

*PGA Tour, Inc. v. Martin*
      532 U.S. 661 (2001)........................................................................19

*Pottgen v. Missouri State High School Activities Ass'n*
      40 F.3d. 926 (8th Cir. 1994) .............................................................15, 19, 20

*Powell v. Nat'l Bd. of Med. Examiners*
      364 F.3d 79 (2d Cir. 2004) ...............................................................23

*Safe Air for Everyone v. Idaho*
      469 F. Supp. 2d 884 (D. Idaho 2006) .......................................................4, 24

*San Francisco Permitholders and Drivers Ass'n. vs. San Francisco*
      2002 WL 1485354 at *5 (July 11, 2002) .................................................8, 9

*Sandison v. Michigan High School Athletic Ass'n, Inc.*
      64 F.3d 1026 (6th Cir. 1995) .............................................................15, 19, 20

*Southeastern Comm. Coll. v. Davis*
   442 U.S. 397 (1979)............................................................................................23

*Southeastern Comm. Coll. v. Davis*
   442 U.S. 397 (1979))..........................................................................................19

*Tennessee v. Lane*
   541 U.S. 509 (2004)...........................................................................2, 3, 4, 13, 19

*Vinson v. Thomas*
   288 F.3d 1145 (9th Cir. 2002) ...........................................................................15

*Wong v. Regents of Univ. of Cal.*
   192 F.3d 807 (9th Cir. 1999) .............................................................................14

*Zukle v. Regents of Univ. of Cal.*
   166 F.3d 1041 (9th Cir. 1999) .............................................................14, 18, 23


**Federal Statutes**

28 C.F.R.
   § 35.130(b)(7) ........................................................................................2, 13, 18

42 U.S.C.
   § 12131(2).....................................................................................................13, 14
   § 12132 ..........................................................................................1, 2, 3, 13
   § 12182(b)(2)(A)(ii)...........................................................................................19

F.R.C.P.
   56 ........................................................................................................................1
   56(c) ..................................................................................................................13

Rehabilitation Act
   § 504 ..................................................................................................................15


**San Francisco Statutes, Codes & Ordinances**

Admin. Code
   Appx. 6 § 1...........................................................................................................5
   Appx. 6 § 2(b)......................................................................................1, 2, 5, 6, 7
   Appx. 6 § 3(d)......................................................................................1, 2, 5, 6
   Appx. 6 § 4............................................................................................................6
   Appx. 6 § 4(a).......................................................................................................7

Charter
   § 4.133 .................................................................................................................7

1

Police Code

§ 1076(o) ................................................................................6, 18

§ 1081(f) ....................................................................1, 2, 6, 10, 18

§ 1090(a)(i) .....................................................................................6

§ 1096 .............................................................................................6

§ 1096(c) .........................................................................................7

§ 1124 .............................................................................................6

§ 1186 .............................................................................................6

§ 1186(a) ....................................................................1, 2, 6, 10, 18

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### NOTICE OF MOTION

PLEASE TAKE NOTICE THAT on April 8, 2008 at 9:00 a.m. in Courtroom 2 of the United States District Court of the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, defendants City and County of San Francisco and Taxi Commission ("City" or "San Francisco") hereby do move the Court for an order pursuant to Federal Rule of Civil Procedure 56 granting summary judgment and/or partial summary judgment[1] in favor of the City on the single claim underlying plaintiffs' causes of action for declaratory and injunctive relief: that the Americans With Disabilities Act ("ADA") requires the City to waive its driving requirement for medallion holders with disabilities.

This motion is made on the ground that Title II of the ADA, 42 U.S.C. § 12132, does not require the City to exempt disabled individuals from its statutory, voter-mandated requirement that taxi medallion holders personally drive their cabs in order to hold a medallion. This driving requirement is an essential eligibility requirement of the City's taxi medallion program that has been mandated by the voters and the Board of Supervisors. *See* San Francisco Admin. Code, Appx. 6 §§ 2(b), 3(d); San Francisco Police Code §§ 1081(f), 1186(a). As a matter of law, the ADA does not require the City to fundamentally alter its program by waiving an essential eligibility requirement.

This motion is based on this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declaration of Heidi Machen in Support of Defendants' Motion for Summary Judgment; the Declaration of Paul Gillespie in Support of Defendants' Motion for Summary Judgment; Defendants' Request for Judicial Notice In Support of Motion for Summary Judgment; all exhibits attached to any of the foregoing; moving Defendants' reply papers to be filed in support of this motion; and the complete files and records of this action and such other and further matters as may be presented to the Court at the time of the hearing.

Dated: February 15, 2008

DENNIS J. HERRERA
City Attorney
WAYNE SNODGRASS
VINCE CHHABRIA
FRANCESCA GESSNER
Deputy City Attorneys

By:_____/s/_____
FRANCESCA GESSNER

_____

[1] Although the City believes that a ruling on this legal question will resolve the case in its entirety, it has titled this motion a motion for summary judgment and/or partial summary judgment in order to be consistent with the Joint Case Management Statement. *See* Joint Case Management Statement at 10- 12 (filed 10/26/07).

# SUMMARY OF ARGUMENT

Under Proposition K, an initiative ordinance approved by the San Francisco voters in 1978, and several provisions of the San Francisco Police Code adopted by the Board of Supervisors, taxi permits ("medallions") are public property owned by the City and County of San Francisco ("City") and licensed to individual working cab drivers.  To ensure that medallions are held by working cab drivers, City law requires medallion holders to drive a set number of shifts or hours per year.  *See* S.F. Admin. Code Appx. 6 §§ 2(b), 3(d); S.F. Police Code §§ 1081(f), 1186(a).  The Taxi Commission, the Board of Supervisors, and the voters have all recognized the driving requirement is an essential feature of being a medallion holder and that failure to drive is grounds for revocation of a medallion. The Taxi Commission does allow short-term temporary waivers or modifications of the driving requirement for persons who are temporarily unable to fulfill the requirement due to a disability.

Title II of the Americans With Disabilities Act, 42 U.S.C. § 12132 ("ADA"), requires the City to provide "reasonable modifications" to make its medallion program accessible to disabled individuals, unless such modification would "fundamentally alter" the nature of the program.  28 C.F.R. § 35.130(b)(7).  The City's duty to provide a "reasonable modification" does not extend to waiving or compromising an essential eligibility requirement of the program.  *See Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004).  Plaintiffs' requested modification – indefinite annual waivers of the driving requirement – would require the City to ignore an essential eligibility requirement of its medallion program and thereby fundamentally alter the nature of the program.  It would allow medallion holders to keep their medallions for years on end even though they no longer drive, thereby transforming the program into a *de facto* disability income or retirement program – something it was never intended to be.  A class of absentee medallion holders would derive their taxi incomes exclusively from the work of non-medallion holding drivers.  Given the finite number of medallions, Plaintiffs' requested accommodation would result in delaying or denying medallions to many working cab drivers on the City's 3,000 person-long medallion waiting list.  It would thus stand the City's medallion program on its head, by favoring nondrivers over drivers.  Such a radical alteration of the City's medallion program is not a "reasonable modification" required by the ADA.  28 C.F.R. § 35.130(b)(7).

1

2

### MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The City and County of San Francisco ("City") has taken an innovative approach to the licensing of taxicabs in its jurisdiction. This approach was first adopted in 1978, with the passage of Proposition K by the voters, and subsequently codified by the Board of Supervisors in the Police Code. Proposition K's stated purpose was to shift the City's taxi permitting process from a system that allowed nondrivers (both companies and individuals) to hold medallions as private property to be bought and sold for large sums of money, to a system in which medallions belonged to the City and could only be issued to individual working drivers who would pay a nominal processing fee to obtain the medallion. Towards that end, the voters required medallion holders to personally drive their own cabs for a certain number of shifts per year. Since 1978, the driving requirement has been codified and re-codified by the Board of Supervisors, implemented by the San Francisco Taxi Commission ("Commission") through resolutions and regulations, and reaffirmed by the voters as recently as 2003. When they are not personally driving, City law allows medallion holders to lease their medallion to a cab company, which garners upwards of $1,900 per month.

Plaintiffs claim that Title II of the Americans With Disabilities Act, 42 U.S.C. § 12132 ("ADA"), requires the City to waive entirely the driving requirement for disabled medallion holders who are unable to drive. The Supreme Court has made clear, however, that a public entity's duty under the ADA to provide a "reasonable modification" to make a program accessible to the disabled does not extend to waiving an essential eligibility requirement of the program, and does not compel a modification that would fundamentally alter the nature of the program. *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (the ADA "does not require States to compromise their essential eligibility criteria for public programs. It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided …").

Here, the driving requirement is an essential eligibility requirement of the City's taxi medallion program. For persons who are temporarily disabled, the City does allow temporary waivers or reductions of the driving requirement. Pursuant to a California Court of Appeal decision which found that the City had the discretion to make only "some limited allowance" for disabled

1   medallion holders in defining and administering the driving requirement, the Commission adopted a

2   policy in 2006 allowing for temporary reductions or waivers of the driving requirement for medallion

3   holders who are temporarily unable to drive due to a disability.  Under this policy, set forth in

4   Commission Resolution No. 2006-28, medallion holders may seek either (1) a one-year exemption

5   from the driving requirement for a catastrophic recoverable illness or (2) 120 days leave per year

6   from the driving requirement for up to three consecutive years.

7          But to go even further – for example, to require the City to grant waivers to persons who are

8   indefinitely or permanently unable to drive – would fundamentally alter the nature of the City's taxi

9   program because it would allow disabled persons to hold medallions for the rest of their lives without

10  driving.  It would convert the medallion program into a *de facto* disability or retirement program

11  wherein the large majority of drivers who do not hold a medallion would supply the labor to finance

12  the income of disabled medallion holders.  By creating a class of "absentee" medallion holders, it

13  would subvert a key purpose of Proposition K and the Police Code, which is to ensure that medallions

14  are in the hands of working cab drivers.  Nondrivers holding medallions would be favored over

15  drivers on the medallion waiting list.  This outcome would turn the City's taxi laws upside down.

16         Of course, the City – including its voters and legislators – could have chosen to adopt a taxi

17  permitting program that countenanced absentee medallion holders.  But that is not the program the

18  City has adopted.  And courts will not substitute their own concept of the proper purposes of a public

19  program for those embodied in the eligibility requirements adopted by the legislative branch.  *See*

20  *Aughe v. Shalala*, 885 F. Supp. 1428, 1433 (W.D. Wash. 1995); *Safe Air for Everyone v. Idaho*, 469

21  F. Supp. 2d 884 (D. Idaho 2006).  A holding that the ADA requires the City to allow people who

22  cannot drive to hold a taxi medallion, would distort not only the City's medallion program, but the

23  ADA itself, which was never intended to be a bludgeon forcing public entities to change basic

24  program requirements.  Because, as a matter of law, the duty to provide a reasonable modification

25  does not require the City to "compromise [its] essential eligibility criteria" or "fundamentally alter the

26  nature of the service provided," Plaintiffs' claim cannot stand.  *Lane*, 541 U.S. at 532.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

A.      **Proposition K and the Driving Requirement**

In 1978, San Francisco voters approved Proposition K, an initiative ordinance creating an innovative system of taxi regulation in the City. *See* San Francisco Admin. Code, Appx. 6.[2] Under Proposition K, medallions issued after 1978 are public assets owned by the City, not by the medallion holder, and are issued to individual drivers for a nominal processing fee. Medallions are held by individuals, not companies, and a person may not hold more than one medallion or sell or transfer his medallion to another person. *See* S.F. Admin. Code, Appx. 6 § 1. Individual drivers are granted a medallion by the City after reaching the head of a waiting list. Medallion holders are required to be active drivers. *See id*. at § 2(b), 3(d). The system created by Proposition K thus stands in contrast to systems like New York City's, in which medallion holders actually own their medallions (purchasing them for upwards of $200,000), and in which most owners are not required to drive their cars. *See* Request for Judicial Notice in Support of Defendants' Motion for Summary Judgment ("RJN") Exh. B (SPUR Report at 9-10). These owners can simply lease the cars to drivers, and reap a portion of the profits of the drivers' work. *See id*.

One of the major goals of Proposition K was to place taxi medallions in the hands of working cab drivers. According to the official ballot argument in favor of Proposition K, the then-existing system hurt the "individual taxicab driver who wants to obtain a permit and be allowed to engage in the taxicab business himself," and Proposition K would mean that "new permits would be issued to people who actually want to drive a taxicab." RJN Exh. C (1978 Voter Information Pamphlet at 37).

In accordance with the principle that medallions should be held by drivers, not companies, Proposition K requires that medallion holders personally drive their cabs for a certain number of shifts per year. Specifically, Proposition K requires (1) every applicant for a medallion to declare under penalty of perjury his or her intention to "actively and personally" drive his/her cab "for at least four hours during any 24-hour period on at least 75 percent of the business days during the calendar

---

[2] Proposition K is codified at San Francisco Administrative Code Appendix 6, which is attached as Exhibit A to the City's Request for Judicial Notice.

year" and (2) the Taxi Commission,[3] in determining whether to issue a permit, to find that the applicant will be a "full-time driver" as defined in (1). *See* S.F. Admin. Code, Appx. 6, §§ 2(b), 3(d).

In practice, the City interprets Proposition K's driving requirement to require medallion holders to drive a total of 156 four-hour shifts per year. Declaration of Heidi Machen in Support of Defendants' Motion for Summary Judgment ("Machen Decl.") at ¶ 3. The Board of Supervisors has codified and re-codified this driving requirement in the San Francisco Police Code, which twice states that permit holders must be "full-time drivers" (S.F. Police Code, §§ 1081(f), 1186(a)),[4] and twice identifies the failure to drive as the basis for imposing sanctions on the nondriving medallion holder. *Id.* §§ 1090(a)(i), 1186. In 2004, the Board of Supervisors amended the Police Code to state an alternative test, measured as driving 800 hours per year, for satisfying the driving requirement.[5] *See* RJN Exh. E (Ordinance No. 040343 Legislative Digest); S.F. Police Code § 1076(o).

In addition to the driving requirement, City law also requires medallion holders to keep their medallions in "continuous operation," meaning they must "regularly and daily operate or arrange for the operation of their motor vehicle for hire during each day of the year …." S.F. Police Code § 1096; *see also* S.F. Admin. Code Appx. 6 § 4. When a medallion holder is not personally driving, he or she may "operate" the medallion by leasing it out to a cab company for approximately $1,900 per month. *See* S.F. Police Code § 1124; Machen Decl. at ¶ 3.

Presently, there are 1,431 medallions issued by the City. Machen Decl. at ¶ 4. This number is far lower than the number of drivers who wish to have medallions. There is a waiting list of over 3,000 persons seeking a medallion. Machen Decl. at ¶ 4. Although the Commission occasionally increases the overall number of medallions, in general, a person on the waiting list must wait for an

---

[3] Proposition K originally gave the Police Commission authority over taxi permitting. *See* S.F. Admin. Code Appx. 6. As discussed *infra*, in 1998, the voters passed a ballot measure which transferred authority for taxicab regulation to a newly created Taxi Commission.

[4] The pertinent portions of the San Francisco Police Code governing taxicabs are attached as Exhibit D to the City's Request for Judicial Notice.

[5] Although sometimes referred to as the "full-time" driving requirement, it does not actually require a medallion holder to drive 40 hours per week all year long; rather, it requires medallion holders to drive a substantial amount each year as measured by the quantitative formulas in the Police Code and Proposition K.

1  existing medallion to be returned to the City in order to obtain a medallion.  The wait to receive a

2  medallion is presently 13-14 years.  Machen Decl. at ¶ 4.

3  **B.     The Creation of the Taxi Commission and Its 2002 ADA Resolutions**

4        From 1978 until 1999, the Police Commission's Taxi Detail was responsible for monitoring

5  compliance with the legally mandated driving requirement.  Declaration of Paul Gillespie in Support

6  of Defendants' Motion for Summary Judgment ("Gillespie Decl.") at ¶ 5.  Because of limited staff, the

7  Police Taxi Detail enforced the driving requirement primarily on a complaint-driven basis.  Gillespie

8  Decl. at ¶ 5.

9        In November 1998, the San Francisco voters passed a ballot measure transferring authority for

10 taxi regulation from the Police Commission to a newly created Taxi Commission.  Gillespie Decl. at

11 ¶ 5.  The ballot measure gave the Taxi Commission authority under the City Charter to set policies for

12 the regulation and administration of the taxi permitting system.  *See* RJN Exh. F (Charter § 4.133).

13 During approximately its first two years of existence, the Taxi Commission had no Executive

14 Director or staff.  Gillespie Decl. at ¶ 6.  In 2001, Naomi Little (now Naomi Kelly) was appointed

15 Executive Director.  Gillespie Decl. at ¶ 6.  Around this time, medallion holders began raising the

16 issue of modifying the driving requirement for medallion holders who have a medical condition that

17 prevents them from driving.  Gillespie Decl. at ¶ 6.  At this time, the only modification of the driving

18 requirement that existed was a 90-day hardship waiver provided in the text of both Proposition K and

19 the Police Code.[6]  S.F. Admin. Code Appx. 6 § 4(a); S.F. Police Code § 1096(c); Gillespie Decl. at ¶

20 6.

21 **1.     Taxi Commission Resolution No. 2002-14**

22       In February 2002, the Commission adopted Resolution No. 2002-14, approving its first policy

23 regarding the processing of requests for ADA modifications of taxi permit requirements.  RJN Exh. G

24 (Resolution No. 2002-14).  The policy was intended to allow medallions holders to seek

25 _____

26       [6]  Proposition K and the Police Code allow medallion holders to "suspend operation" of their
   medallions for 90 days in any one 12 month period in case of sickness, death or other hardship.  *See*
   S.F. Admin. Code Appx. 6 § 2(b); S.F. Police Code § 1096(c).  For many years, this provision has
27 been administratively interpreted to authorize a 90-day waiver of the driving requirement for sickness
   or hardship.  Gillespie Decl. at ¶ 6.

28

accommodations that would allow them to fulfill permitting requirements, for example, by providing special equipment for a vehicle seat or an exemption from night-time driving.  Gillespie Decl. at ¶ 7. The procedures allow a medallion holder to request an accommodation by submitting (1) a written request for modification form, (2) a medical authorization and release form, and (3) medical documentation.  RJN Exh. H (Processing ADA Requests).  The Commission's ADA Coordinator then evaluates each medallion holder's request for an accommodation to assess what, if any, reasonable accommodation could be offered to that individual.  The Coordinator then makes a recommendation to the Executive Director who makes the final decision.  *Id*.  Although the policy does not specify types of accommodations to be granted, it states the following "general principles" that govern evaluation of requests:  "The ADA does not mandate that a permit holder be exempted from an essential eligibility requirement of the program.  Nor does it require modification of a rule, policy or practice if doing so would fundamentally alter the nature of the program."  *Id*.  If a request is denied, the Resolution allows a medallion holder to appeal to the Commission within 30 days of the decision. *Id*.

### 2.    2002 California Court of Appeals Decision

In 2000, medallion holders sued the City in state court, challenging the existence of the driving requirement and several administrative rules and practices implementing the requirement.  In July 2002, the California Court of Appeal issued its decision, affirming "the strong policy of Proposition K favoring full-time operation of taxicabs by permit holders."  *San Francisco Permitholders and Drivers Ass'n. vs. San Francisco*, 2002 WL 1485354 at *5 (July 11, 2002).[7]  In that decision, the appellate court held that failure to meet the driving requirement was "grounds for discretionary revocation of a taxicab permit."  *Id.* at *6.  In response to the medallion holders' claim that the City should adopt a "flexible interpretation" of the driving requirement to accommodate medallion holders who have become unable to drive, the Court of Appeal held that Proposition K

> … would allow the enactment of local legislation or regulations, or the exercise
> of discretion under existing legislation and regulations, so as to make *some
> limited allowance*, consistent with the strong policy of Proposition K favoring

---

[7] The court's decision is attached as Exhibit I to the City's Request for Judicial Notice.

1   full-time operation of taxicabs by permit holders, for a permit holder's
    leadership position in a taxicab cooperative or physical disability.

2   *Id.* at *5 (emphasis added).  Up until this time, the Commission had been operating under the belief

3   that it would be a violation of Proposition K to grant any reduction of the driving requirement beyond

4   the 90-day waiver provided in the law.  Gillespie Decl. at ¶ 10; RJN Exh. J (Aug. 5, 1999 T. Owen

5   Memorandum).  The court decision thus opened the door for the City to make some allowance in

6   Proposition K's quantitative formula for measuring full-time driving, while noting that any such

7   allowance must be "limited" in scope.

8               **3.     Taxi Commission Resolution No. 2002-93**

9         In October 2002, the Commission adopted Resolution No. 2002-93, which stated that driving

10  was an "essential eligibility requirement of the City's programs for the permitting of motor vehicles

11  for hire, and that exempting a permitholder from that requirement would fundamentally alter the

12  nature of those programs."  RJN Exh. K (Resolution No. 2002-93).  The Resolution explained that

13  Proposition K's "main purpose" of creating a system in which only bona fide drivers would hold

14  permits "will be compromised if nondrivers are allowed to hold permits, because in every such case,

15  the nondriver would hold the permit at the expense of an actual driver who otherwise would be issued

16  the permit."  *Id.*  Although the Resolution made clear that the City could not *exempt* a medallion

17  holder from the driving requirement, it also stated that the City could, pursuant to the California

18  Court of Appeal decision, "make some limited allowance for disabled permitholders by employing an

19  alternative definition, provided that the alternative definition complies with Proposition K's mandate

20  that permitholders drive on a continuous basis."  *Id.*

21          **C.     The Voters' 2003 Rejection of Proposition N**

22        In November 2003, the question of whether disabled medallion holders should be exempted

23  from the legal driving requirement was squarely presented to the voters.  Proposition N, a one-

24  sentence ballot measure, plainly stated:  "Any taxicab permit holder who is unable to comply with a

25  driving requirement due to disability shall not be subject to permit revocation or suspension for

26  failure to comply with the driving requirement."  RJN Exh. L (2003 Voter Information Pamphlet at

27  196).  The Ballot Simplification Committee's digest in the voter information pamphlet explained:  "If

28  you vote 'No,' you do not want to prevent the City from taking away a taxi permit if the permit holder

is unable to meet the minimum driving requirement because of a disability."  RJN Exh. L (2003 Voter Information Pamphlet at 189).  The voters overwhelmingly rejected Proposition N by a margin of 72% to 28%.  *See* RJN Exh. M (Nov. 2003 S.F. Dept. Elections Results).  The Commission understood the resounding rejection of Proposition N to be a loud and clear message that City policy, as expressed by the voters, is that medallions should "go to working drivers and they are not retirement pensions for ex-cab drivers."  Declaration of Francesca Gessner in Support of Defendants' Motion for Summary Judgment ("Gessner Decl.") at ¶ 3 (Cmsr Gillespie, 1/24/06); Gillespie Decl. at ¶ 9.  Shortly following the rejection of Proposition N, the Board of Supervisors in 2004 adopted legislation that, in accordance with the will of the voters, reaffirmed that medallion holders must personally drive their cabs.  *See* RJN Exh. E (Leg. Digest & Ordinance No. 111-04); S.F. Police Code §§ 1081(f), 1186(a).

### D.    Taxi Commission Resolution No. 2006-28

In February 2006, the Commission adopted Resolution No. 2006-28, which set forth limited modifications of the driving requirement for persons who are temporarily unable to drive due to a disability.  This resolution was the first time that the Commission established a policy for allowing waivers of the driving requirement beyond the 90-day waiver provided in Proposition K and the Police Code.  Gillespie Decl. at ¶ 10.

The resolution set forth two types of permissible variations to the driving requirement for "disabled medallion-holders who are otherwise qualified to hold taxicab permits":  (1) a 120-day maximum leave per year from the driving requirement with a three consecutive year cap and (2) up to a full year exemption from the driving requirement once per five years for treatment for catastrophic recoverable illness.  *See* RJN Exh. N (Resolution No. 2006-28).

In practice, the first category – the 120-day leave – amounts to a one-third reduction in the annual driving requirement (since 120 days equals one third of a year), in contrast to the one-fourth reduction allowed by the existing 90-day waiver.  Machen Decl. at ¶ 5.  This one-third reduction means that the medallion holder must drive either 104 four-hour shifts per year (a one third reduction of Proposition K's 156 four hour shifts) or 533 hours per year (a one third reduction of the Police Code's required 800 hours).  Machen Decl. at ¶ 5.

1    The second category for "catastrophic recoverable illness" applies to medallion holders who

2  have an illness that is both (1) catastrophic, such as a heart attack or cancer, and (2) recoverable,

3  meaning that it is reasonably expected that they will be able to return to driving within one year.

4  Machen Decl. at ¶ 5; Gillespie Decl. at ¶ 11.

5    At a January 2006 hearing at which the Commission considered Resolution 2006-28, it made

6  clear that "the key of this resolution is recoverability … it is geared to an accommodation for people

7  that will recover and continue to do their job.  It is not, nor was it intended to be, any kind of

8  retirement program."  Gessner Decl. at ¶ 4 (Cmsn. President Jackson, 1/24/06).  The Commission also

9  made clear that the policy did not allow "someone who is simply never going to drive again to get an

10  annual ADA [waiver] when we know they are never going to drive again. . . . ADA is not a

11  retirement. It's an accommodation."  Gessner Decl. at ¶ 4 (Cmsn. President Jackson, 1/24/06).

12    **E.    Slone and Merrithew's Requests for Waivers of the Driving Requirement**

13    Plaintiff William Slone has submitted two requests for ADA accommodations to the

14  Commission.  His first, submitted in 2003, stated that he had "difficulty breathing," and asked to have

15  the driving requirement "reduced and/or have this requirement removed."  Machen Decl., Exh. A.  He

16  also stated that his medical condition was "perminate [sic]."  Machen Decl., Exh. A.  An incomplete

17  "Healthcare Provider Certification" form from his doctor was submitted in 2005, which stated that

18  Slone had "chronic lung disease"[8] and that his condition was *not* temporary.  Machen Decl., Exh. B.

19  No action was taken on this request because of the incomplete documents.  Machen Decl., Exh. C.  In

20  November 2007, following the filing of this lawsuit, Slone submitted a second request, along with a

21  "Healthcare Provider Certification," in which his doctor stated that his disability was not temporary

22  and that "the driving requirement needs to be waved [sic]."  Machen Decl., Exh. D.  No action has

23  been taken on this request pending the outcome of this suit.

24    On May 10, 2006, plaintiff Michael Merrithew submitted to the Commission a request for an

25  ADA accommodation asking for "deferment of driving requirements."  Machen Decl., Exh. E.  On

26  Merrithew's "Healthcare Provider Certification" form, his physician listed his disability as

27

---

[8] The Complaint identifies Slone's disability as "wasting lung disease."  Complaint at ¶ 7.

28

"degenerative lumbar disk [sic]" and "repetitive overuse syndrome" in his right shoulder.  Machen Decl., Exh. E.  The physician asked that Merrithew be "excused from driving requirement" because he was "not able to drive."  Machen Decl., Exh. E.  The physician also checked a box on the form, which stated that Merrithew was "unable to perform w/ or w/o an accommodation."  Machen Decl., Exh. E.  Merrithew listed the expected duration of his disability as one year.  Machen Decl., Exh. E. On August 16, 2006, the Commission denied Merrithew's request because his request did not fall under either of the two categories of modifications set forth in Resolution 2006-28: (1) his disability did not qualify as a "catastrophic recoverable illness" eligible for a one-year exemption, and (2) the 120-day leave would not allow him to meet the driving requirement since, as his physician stated, he was "not able to drive" at all.  Machen Decl. at ¶ 8, Exh. F.  Merrithew appealed the Executive Director's decision and the Commission denied his appeal at a public hearing on January 9, 2007. RJN Exh. O (Commission Meeting Minutes 1/9/07).

### F.      The Lawsuit

On June 26, 2007, Plaintiffs Slone and Merrithew filed this lawsuit, seeking declaratory and injunctive relief on the theory that the ADA requires the City to waive the driving requirement for medallion holders who are unable to drive due to a disability.  Complaint for Declaratory Relief and Injunction ("Complaint") at ¶¶ 11, 16.  The Complaint states that Plaintiffs are each "unable to operate his taxicab vehicle personally" due to a physical disability.[9]  Complaint at ¶¶ 7, 8.  Plaintiffs contend that the City should "modify or waive" the driving requirement for disabled drivers, "subject to annual review," "until their disabilities have medically resolved."  Complaint at ¶¶ 11, 16, 87, 88. They claim that they should be allowed to keep their medallions without driving so long as they continue to "operate" their permits by keeping the vehicle on the street and leasing it out to other drivers.  Complaint at ¶¶ 11, 16.  Since the filing of this lawsuit, 34 medallion holders have submitted applications to the Commission for the first time seeking waivers of the driving requirement.  Machen Decl. at ¶ 9.

---

[9] The Complaint identifies Slone's disability as "wasting lung disease." Complaint at ¶ 7.

The parties have agreed that whether the ADA requires the City to waive the driving requirement for medallion holders can likely be resolved on summary judgment.  *See* Joint Case Management Statement at 8-9, 11 (filed 10/26/07).

## LEGAL STANDARDS

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-249 (1986).  A fact is "material" if the fact may affect the outcome of the case.  *Id*. at 248.  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

## DISCUSSION

## I.    DRIVING IS AN ESSENTIAL ELIGIBILITY REQUIREMENT OF THE CITY'S PROGRAM, WAIVER OF WHICH IS NOT A REASONABLE MODIFICATION BECAUSE IT WOULD FUNDAMENTALLY ALTER THE PROGRAM

Title II of the ADA prohibits a public entity from discriminating against "qualified individuals" with disabilities in the provision of public services, programs, or activities.  42 U.S.C. § 12132.  Under Title II, a public entity is required to make "reasonable modifications" in policies, practices or procedures to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modification would "fundamentally alter" the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7).  As the Supreme Court has made clear, Title II "does not require States to compromise their essential eligibility criteria for public programs.  It requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual is otherwise eligible for the service."  *Tennessee v. Lane,* 541 U.S. 509, 531-32 (2004) (citing 42 U.S.C. § 12131(2)).

To establish a prima facie case of discrimination based on disability in violation of Title II, Slone and Merrithew must produce evidence that: (1) they are "disabled" within the meaning the

1   ADA; (2) they are "otherwise qualified" to be medallion holders, (3) they were denied benefits solely

2   because of their disability; and (4) the City is a public entity.  *See Wong v. Regents of Univ. of Cal.*,

3   192 F.3d 807, 816 (9th Cir. 1999).  For purposes of this motion only, the City does not dispute the

4   first, third and fourth prongs of this test.

5          The City does dispute the second prong, however.  The ADA defines a "qualified individual"

6   as one who "*with or without reasonable modifications* to rules, policies, or practices, the removal of

7   architectural, communication, or transportation barriers, or the provision of auxiliary aids and

8   services, *meets the essential eligibility requirements* for the receipt of services or the participation in

9   programs or activities provided by a public entity."  42 U.S.C. § 12131(2) (emphasis added).

10  Plaintiffs bear the initial burden of producing evidence that they are "otherwise qualified," meaning

11  that there is a reasonable accommodation that would enable them to meet the City's essential

12  eligibility requirements.[10]  *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir. 1999).

13  Thereafter, the burden shifts to the City to produce evidence that the requested accommodation is not

14  reasonable, *i.e.*, would require a fundamental modification of its program or standards.  *Id.*

15         As explained below, there is no disputed issue of material fact with respect to the question

16  whether the ADA requires the City to grant waivers of the driving requirement beyond that which is

17  already allowed by Resolution No. 2006-28.  Driving is an essential eligibility requirement of the

18  City's program that Plaintiffs cannot meet.  As a matter of law, the ADA does not require the City to

19  fundamentally alter its taxi medallion program in the manner sought by the Plaintiffs, *i.e.*, waiving the

20  driving requirement on an annual basis for an indefinite period of time.  Because Plaintiffs' requested

21  modification would fundamentally alter the nature of the City's taxi program, it is not a "reasonable

22  modification" and therefore not required by the ADA.  *See Aughe v. Shalala*, 885 F. Supp. 1428,

23  1432-33 (W.D. Wash. 1995).

24

25

26         ————————————————

27  [10] "Although Title II of the ADA uses the term 'reasonable modification' rather than 'reasonable accommodation,' these terms do not differ in the standards they create."  *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999).

28

1

**A.    Driving Is An Essential Eligibility Requirement Of The City's Taxi Medallion Licensing Program Because It Is Necessary To Accomplish Its Purpose**

2

In determining whether an eligibility requirement is "essential," courts look to "the importance

3

of the requirement to the … program."  *Pottgen v. Missouri State High School Activities Ass'n*, 40

4

F.3d. 926, 930 (8th Cir. 1994).[11]  "Eligibility requirements are deemed 'essential' or 'necessary' when

5

such requirements are reasonably necessary to accomplish the purposes of a particular program."

6

*Cole v. Nat'l Collegiate Athletic Ass'n*, 120 F. Supp. 2d 1060, 1070-71 (N.D. Ga. 2000).  In assessing

7

whether a requirement is "essential," courts do not substitute their own concept of the proper purposes

8

of a program for those embodied in the eligibility requirements adopted by the legislative branch.  *See*

9

*Aughe*, 885 F. Supp. at 1433.

10

The decision must be based on a fact-specific assessment of the nature of the program and the

11

criteria necessary to implement its purpose.  For example, in determining whether a high school

12

sports association's under-nineteen age requirement was an essential eligibility requirement under the

13

ADA, both the Sixth and Eighth Circuits examined the *purposes* advanced by the age restriction.  The

14

courts observed that the age restriction served several important purposes such as "protect[ing]

15

younger athletes from harm," "discourag[ing] student athletes from delaying their education to gain

16

athletic maturity," and preventing "any unfair competitive advantage that older and larger participants

17

might provide."  *Sandison v. Michigan High School Athletic Ass'n, Inc*., 64 F.3d 1026, 1035 (6th Cir.

18

1995); *Pottgen*, 40 F.3d. at 929; *see also McPherson v. Michigan High School Athletic Ass'n, Inc.*,

19

119 F.3d 453, 461-62 (6th Cir. 1997) (holding that "eight semester rule" limiting student's athletic

20

eligibility to eight consecutive semesters of high school was essential to preserving the purpose of the

21

sports program).  Likewise, in two cases involving whether the National Collegiate Athletic

22

Association's ("NCAA") minimum academic requirements for student athletes are essential eligibility

23

requirements, the courts examined the purpose of the NCAA's program.  Because one of the NCAA's

24

"primary purposes is to support academic success of athletes," the courts concluded that the minimum

25

26

[11] Some of the cases cited below, including *Pottgen*, involve claims under Section 504 of the Rehabilitation Act.  The Ninth Circuit has made clear, however, that "there is no significant difference in the analysis of rights and obligations created by" the ADA and the Rehabilitation Act. *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

27

28

1    requirements for course loads and grade point averages were essential to its program.  *Matthews v.*

2    *Nat'l Collegiate Athletic Ass'n*, 79 F. Supp. 2d 1199, 1206 (E.D. Wash. 1999); *see also Cole*, 120 F.

3    Supp. 2d at 1071 (holding that minimum academic score for student-athletes is an essential eligibility

4    requirement because it is "integral to the NCAA's mission of maintaining amateurism in

5    intercollegiate sports").

6          Similarly in *Easly v. Snider*, 36 F.3d 297 (3rd Cir. 1994), in determining whether a state law's

7    requirement that disabled persons be "mentally alert" in order to participate in a state program was an

8    essential eligibility requirement, the Third Circuit examined the "purposes sought to be accomplished

9    by the legislature" in enacting the program.  *Id.* at 304.  The court noted that the "state intended that

10   the delivery of services to the physically disabled preserve their independence."  *Id.* at 303.  The court

11   concluded, "An examination of the actual services offered demonstrates that personal control is

12   essential to the program, and that mental alertness is a necessary requirement for receipt of the

13   program's essential benefit …."  *Id.*; *see also Aughe,* 885 F. Supp. at 1431 (requirement that

14   dependant children complete high school by age nineteen to receive welfare benefits is an essential

15   eligibility requirement because program's purpose is to help dependant children).

16         In this case, an examination of the nature and purpose of the City's taxi program makes clear

17   that the driving requirement is an essential eligibility requirement of the program.  *Cole*, 120 F. Supp.

18   at 1070-71.  One of Proposition K's main purposes was to shift the City's taxi permitting process from

19   a system that allowed nondrivers (whether companies or individuals) to hold permits, to a system in

20   which the City owns the medallions and issues them to bona fide drivers only.  According to the

21   official ballot argument in favor of Proposition K, the previously existing taxi permitting system hurt

22   the "individual taxicab driver who wants to obtain a permit and be allowed *to engage in the taxicab*

23   *business himself*."  RJN Exh. C (1978 Voter Information Pamphlet at 37) (emphasis added).  As the

24   ballot argument explained,

25              Under this initiative … those who own permits with the sole purpose of
              reselling them for an enormous profit could not do so.  When unused, the
26              permits would return to the Police Commission where new permits would be
              issued to *people who actually want to drive a taxicab*.

27   RJN Exh. C (1978 Voter Information Pamphlet at 37) (emphasis added).

28

Thus, as the ballot pamphlet makes clear, one of the purposes of Proposition K was to make City-owned medallions readily accessible to working cab drivers. The medallion was not intended to be a public asset leveraged by private parties purely for private gain. Towards that end, the driving requirement serves to ensure that medallions are held by working drivers, and not simply leased out for profit.

The Commission elaborated on the importance of the driving requirement in Resolution No. 2002-93, explaining that the driving requirement serves to increase the professionalism of drivers and the quality of taxi services, promote stability in the workforce, and promote equity in the cab industry by avoiding the creation of separate classes of owners and workers. Specifically, the Resolution listed the purposes of the driving requirement as follows:

- it tends to promote stability in the driving work force, because if permits can be held by absentees, there will be fewer opportunities for nonpermitholding drivers to obtain permits and thus less incentive for drivers to stay in the industry for lengthy periods of time;

- it tends to promote experience in the driving work force, because it ensures that for a significant part of the time a permitted vehicle is driven, the driver must be someone who drives frequently;

- it tends to promote a sense of equity among the driving work force, because it requires that persons doing the day-to-day work of driving receive the rewards of being a permitholder;

- it tends to promote greater cleanliness, comfort, and safety of vehicles, because the permitholder must drive the permitted vehicle frequently and thus has a personal incentive to ensure that the vehicle is clean, comfortable, and safe; and

- it provides an entrepreneurial opportunity and a degree of upward mobility for drivers; …

RJN Exh. K (Resolution No. 2002-93). Notably, independent groups such as the San Francisco Planning and Urban Research Association ("SPUR") have also recognized that promoting experience and equity in the industry are key purposes of the driving requirement: "The industry structure under Proposition K has helped to retain experienced drivers, due to the requirement that medallion holders be full-time drivers. It also has ensured that medallion holders as well as firms share in industry profits." RJN Exh. B (SPUR Report at 10).

Since the voters' adoption of Proposition K in 1978 and the Taxi Commission's adoption of Resolution 2002-93, both the voters and the Board of Supervisors have confirmed that driving is "an

essential dimension without which the objectives of the program cannot be realized." *Easly*, 36 F.3d.
at 303.  In November 2003, twenty-five years after the voters adopted Proposition K's innovative
medallion system, they resoundingly rejected Proposition N, a measure which, if adopted, would have
prevented the City from revoking a medallion if the medallion holder was unable to meet the driving
requirement because of a disability.  *See* RJN Exh. L (2003 Voter Information Pamphlet at 189).  On
the heels of Proposition N, in 2004, the Board of Supervisors amended the Police Code and expressly
restated that taxi medallion holders must personally drive their taxicabs in order to hold a medallion.
*See* RJN Exh. E (Ordinance No. 111-04 at 16); S.F. Police Code §§ 1081(f), 1186(a).  In accordance
with the California Court of Appeal decision, the Board of Supervisors also reformulated the driving
requirement to allow 800 hours per year of driving to satisfy the requirement.  *See* RJN Exh. E
(Ordinance No. 111-04 at 4); S.F. Police Code § 1076(o).

In sum, the voters, the Board of Supervisors, and the Taxi Commission have all determined
that the driving requirement "is an essential dimension without which the objectives of the program
cannot be realized." *Easly*, 36 F.3d. at 303.  This court must respect the voters' and legislators' policy
choice.  *See, e.g., Aughe*, 885 F. Supp. at 1433.

### B.    Plaintiffs' Requested Modification Is Not Reasonable Because It Would Fundamentally Alter The Nature Of The City's Medallion Program

Because Slone and Merrithew cannot meet the taxi program's essential eligibility requirement
of driving without the modifications they have requested, the next issue is whether the requested
modifications are "reasonable" and therefore required by the ADA.  *Zukle*, 166 F.3d at 1049.

The federal regulations implementing Title II of the ADA require public entities to "make
*reasonable modifications* in policies, practices, or procedures when the modifications are necessary to
avoid discrimination on the basis of disability, unless the public entity can demonstrate that making
the modifications would *fundamentally alter* the nature of the service, program, or activity."  28
C.F.R. § 35.130(b)(7) (emphasis added).  The Supreme Court has made clear that Title II's reasonable
modification requirement "does not require States … to compromise essential eligibility criteria for
public programs.  It requires only 'reasonable modifications' that would not fundamentally alter the
nature of the service provided, and only when the individual seeking modification is otherwise

eligible for the service." *Tennessee v. Lane*, 541 U.S. 509, 532 (2004).  Reasonable accommodations are those that do not require a public entity "to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Pottgen*, 40 F.3d at 930 (quoting *Southeastern Comm. Coll. v. Davis*, 442 U.S. 397, 413 (1979)).

As discussed below, Plaintiffs' requested modification is not "reasonable" within the meaning of the ADA.  The modification Plaintiffs seek would require the City to waive the driving requirement and such a waiver of an essential eligibility requirement would fundamentally alter the City's program.

### 1. Waiver of An Essential Eligibility Requirement Is Unreasonable As A Matter of Law

The Supreme Court has made clear that a public entity's duty under Title II to provide a reasonable modification to disabled persons "does not require [public entities] to compromise their essential eligibility criteria for public programs." *Lane*, 541 U.S. at 532.  Accordingly, as the Supreme Court has explained, "[i]n routine cases, the fundamental alteration inquiry may end with the question whether a rule is essential." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 683 n.38 (2001).[12] That is because "the waiver of an essential rule of [a program] for anyone would fundamentally alter the nature of [the program]." *Id*. at 689.  By contrast, where a rule is deemed not essential, but rather is "at best peripheral to the nature of" a program, "it might be waived in individual cases without working a fundamental alteration." *Id*.

In short, where a court has determined that a requirement is an essential eligibility requirement of a program, and Plaintiffs seek a complete waiver of that requirement, courts have found that such waivers are per se fundamental alterations of the program.  As one district court has observed, "certain eligibility requirements of a program by their nature are essential and *any alteration unreasonable as a matter of law*." *Castellano v. New York*, 946 F. Supp. 249, 254 (S.D.N.Y. 1996) (emphasis added).  In the *Pottgen* and *Sandison* cases discussed *supra*, because the

---

[12] In *PGA Tour*, the Supreme Court addressed the fundamental alteration defense in the context of a claim under Title III of the ADA, rather than Title II.  Title III contains a fundamental alteration defense similar to that for Title II.  *See* 42 U.S.C. § 12182(b)(2)(A)(ii).

plaintiff high school students were over nineteen, they sought a complete waiver of the age requirement.  Both courts rejected the students' claim that waiving the essential eligibility requirement was a reasonable modification:

> Waiving an essential eligibility standard would constitute a fundamental alteration in the nature of the [sports] program.  Other than waiving the age limit, no manner, method or means is available which would permit [the plaintiff] to satisfy the age limit.  Consequently no reasonable accommodations exist.  Since [the plaintiff] can never meet the essential eligibility requirement, he is not an 'otherwise qualified' individual.

*Pottgen,* 40 F.3d at 930.  Indeed, as the *Sandison* court explained, plaintiffs' attempt to characterize a waiver of an essential eligibility requirement as a "reasonable accommodation" poses "a significant peculiarity."  *Sandison*, 64 F.3d at 1035.  As the court explained:

> Ordinarily, an accommodation of an individual's disability operates so that the *disability* is overcome and the disability no longer prevents the individual from participating.  In this case, … the *waiver* of the age restriction is not directed at helping them overcome learning disabilities; the waiver merely removes the age ceiling as an obstacle.

*Id*. (emphasis in original).

Several district courts have similarly held that waiver of an essential eligibility requirement is a per se unreasonable modification:

- In *Aughe v. Shalala, supra,* the court granted summary judgment to the government because waiver of the age nineteen rule for receipt of welfare benefits was not reasonable: "[N]o modification short of waiving the 'completion by nineteen requirement' could make [plaintiffs] into an 'otherwise qualified individual.'  Because that would essentially rewrite the statute, it must be seen as a fundamental alteration in the nature of the program."  *Aughe*, 885 F. Supp. at 1432.

- In *Cole v. NCAA*, *supra*, the court granted defendants' motion to dismiss plaintiff's ADA claim because "court-ordered waiver of the [NCAA's] academic standards would have essentially negated the academic eligibility standards and compromised the purpose of the NCAA. … Abandoning the eligibility requirements altogether for this or any athlete is unreasonable *as a matter of law* and is not required by the ADA."  *Cole*, 120 F. Supp. 2d at 1071 (emphasis added).

- In *Castellano v. New York*, *supra*, the court concluded that a requirement of twenty years of service to receive supplemental retirement benefits was essential to New York City's police retirement program and that "any alteration would change the entire nature" of the program. *Castellano*, 946 F. Supp. at 254.

In *Matthews v. NCAA*, a case perhaps most analogous to the present one, a college athlete argued that the ADA entitled him to annual waivers of the NCAA's minimum academic requirements for student athletes. In that case, the NCAA had granted him waivers of academic requirements for two years in a row. On the third year that he requested a waiver it was denied "because his academic performance had not improved despite two previous waivers." *Matthews*, 79 F. Supp. 2d at 1202. The district court concluded that "[t]o require Defendants to continually issue waivers of its requirements for Plaintiff would be to completely dispense with its essential requirements. This is something that the ADA does not require." *Id*. at 1207.

Here, as in the cases above, Plaintiffs seek a waiver of an essential eligibility requirement, a modification which is "unreasonable as a matter of law." *Cole*, 120 F. Supp. 2d at 1071. As the Complaint states, Slone and Merrithew are each "unable to operate his taxicab vehicle personally." Complaint at ¶¶ 7, 8. Because they simply cannot drive, there is no "modification" short of complete waiver of the driving requirement that would allow Plaintiffs to "satisfy" the essential eligibility requirement. Abolition of a requirement cannot, by any stretch of the imagination or the English language, be a "modification" of that requirement – much less a "reasonable modification" thereof.

Although the Complaint is vague as to the precise nature and duration of Plaintiffs' medical conditions, it claims that the City should "reliev[e] them of the 'full-time driver' provisions of the Police Code" "until their disabilities have medically resolved" and "subject to annual review." Complaint at ¶¶ 11, 16 (emphasis added). Because there is no way of knowing if or when their conditions will be "medically resolved," Plaintiffs' request amounts to waivers on an annual basis for an indefinite period of time. But the courts have made clear that the ADA

> . . . contain[s] no reference to an individual's *future* ability to perform the essential functions of his position. . . . Nothing in the text of the reasonable accommodating provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect. Rather, reasonable accommodation is by its terms most logically construed as that which

1    presently, or in the immediate future, enables the employee to perform the
     essential functions of the job in question.

2    *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) (emphasis in original).  To require the City "to

3    continually issue waivers of its requirements for Plaintiff[s] would be to completely dispense with its

4    essential requirements.  This is something that the ADA does not require."  *Matthews*, 79 F. Supp. at

5    1207.  Thus, the court need look no further than the fact that Plaintiffs seek annual waivers of an

6    essential eligibility requirement to decide that the modification that "is unreasonable as a matter of

7    law and is not required by the ADA."  *Cole*, 120 F. Supp. 2d at 1071.

8           **2.     Plaintiffs' Requested Waiver Of The Driving Requirement Would
                    Fundamentally Alter The Nature Of The City's Taxi Program**

9           Even if Plaintiffs' requested waiver of the driving requirement were not per se unreasonable, it

10   is clear that granting their requested modification "would be so at odds with the *purposes* behind the

11   rule that it would be a fundamental and unreasonable change."  *Jones v. City of Monroe*, 341 F.3d

12   474, 480 (6th Cir. 2003) (internal quotation marks omitted) (emphasis added).

13          Courts have made clear that modifications that would run counter to the *purpose* of a program

14   constitute "fundamental alterations" not required by the ADA.  For example, in *Jones v. City of*

15   *Monroe*, the Sixth Circuit considered whether Title II of the ADA required the City of Monroe to

16   modify its municipal parking program to grant a wheel-chair bound plaintiff free all-day parking

17   adjacent to her workplace.  *Monroe*, 341 F.3d at 475.  The City's parking program allowed one-hour

18   free parking only.  *Id*.  In evaluating whether the City's refusal to modify its parking program violated

19   the ADA, the court explained that "the overall focus should be on whether waiver of the rule in the

20   particular case would be so at odds with the *purposes* behind the rule that it would be a fundamental

21   and unreasonable change."  *Id.* at 480 (internal quotation marks omitted) (emphasis added).  The

22   court then looked to the purpose of the one-hour limitation, observing that it was "[d]esigned to help

23   downtown businesses by making parking spaces in close proximity to them more readily available"

24   and that the City "quite logically has determined" that allowing all-day parking in the current one-

25   hour spaces would "have a negative impact on downtown businesses."  *Id*.  The court thus concluded:

26          The purpose of the one-hour limitation is to encourage patrons to shop at
            downtown businesses. Waiver of the ordinance limiting parking to one hour in
27          the business district would be 'at odds' with the fundamental purpose of the
            rule. By its very nature, the benefit of one-hour free public parking cannot be

28

1
2
3

> altered to permit disabled individuals to park all day without jeopardizing the availability of spaces to other disabled and nondisabled individuals. Such a waiver would also require Monroe to cease enforcement of an otherwise valid ordinance, which by its very nature requires a fundamental alteration of the rule itself.

4
5
6
7

*Id.* Similarly, in *Easly*, the Third Circuit held that waiver of a state program's mental alertness requirement "would be an unreasonable modification" because it would "change the entire focus of the program" and "would create a program that the State never envisioned when it enacted the [legislation]." *Easly*, 36 F.3d at 305.

8
9
10
11
12
13
14
15

In the context of educational institutions, courts have likewise found that public entities are not required "to lower or to effect substantial modifications of standards to accommodate a handicapped person." *Southeastern Comm. Coll. v. Davis*, 442 U.S. 397, 413 (1979); *see also Zukle*, 166 F.3d at 1046, 1049 (holding that medical student's requests to rearrange clerkship schedule and reduce clinical time would have fundamentally altered the nature of medical school's curriculum); *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79 (2d Cir. 2004) (plaintiff's requested accommodation to be allowed to continue in medical school program without first passing exam would have changed the nature and substance of University's program).

16
17
18
19
20
21
22
23
24
25
26

Here, as in the above cases, waiver of the driving requirement would "be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change." *Jones,* 341 F.3d at 480; *see also Easly*, 36 F.3d at 305 (waiver of essential rule would "change the entire focus of the program"). Plaintiffs' requested modification would create a system of absentee medallion holders that would run completely counter to a key purpose of the Proposition K program – which was to shift the City's taxi permitting process from a system that allowed corporations and nondrivers to hold medallions, to a system in which only bona fide drivers can hold City-owned medallions. As the Commission itself explained in Resolution No. 2002-93, Proposition K's "central purpose will be compromised if nondrivers are allowed to hold permits, because in every such case, the nondriver would hold the permit at the expense of an actual driver who would be issued the permit." RJN Exh. K (Resolution No. 2002-93); *see also* Gillespie Decl. at ¶ 12.

27
28

The number of medallions at stake, while not determinative, is significant. There are approximately 1,000 post-Proposition K medallions. Machen Decl. at ¶ 4. Since the adoption of

1   Resolution 2006-28, the Commission has received requests for modifications of the driving

2   requirement from approximately 75 medallion holders.  Machen Decl. at ¶ 9.  Since the filing of this

3   lawsuit, approximately 35 additional medallion holders have submitted applications for ADA

4   accommodations of the driving requirement for the very first time.  Machen Decl. at ¶ 9.

5   Accordingly, were the City required to grant indefinite waivers of the driving requirement, it could

6   affect at least 100 of the Proposition K medallions issued by the City.  Machen Decl. at ¶ 9**.**  It would

7   essentially convert those 100-plus medallions from public assets into private property to be used as a

8   passive source of income until the end of the medallion holders' lives.  Indeed, medallion holders who

9   do not drive at all can earn upwards of $3,000 per month from leasing out their medallion to a cab

10  company.  Machen Decl. at ¶ 3.  By transforming the medallion system into a retirement or disability

11  income program, it would significantly reduce the chances of drivers on the 3,000 person-long

12  medallion waiting list ever obtaining a medallion, and significantly increase the wait for those who

13  eventually do.  *See* Gillespie Decl. at ¶ 12; *See Monroe*, 341 F.3d. at 480 (the city's parking program

14  "cannot be altered to permit disabled individuals to park all day without jeopardizing the availability

15  of spaces to other disabled and nondisabled individuals").  Such a scenario would favor a non-driver

16  over a driver, thus turning the City's program on its head.  For these reasons, requiring the City to

17  grant Plaintiffs' requested modification would "change the entire focus of the program" and "create a

18  program that the [voters] never envisioned when [they] enacted" Proposition K.  *Easly*, 36 F.3d at

19  305.

20          To be sure, the City could have chosen to create a taxi program that did not require medallion

21  holders to be drivers.  But that is not the program that San Francisco has adopted and sustained for

22  the last thirty years.  The City stands behind the program as a sound and innovative approach to taxi

23  permitting.  As another court has cautioned in the context of a Title II ADA claim, "The judiciary is

24  not the place for policy changes or fundamental alterations to enacted legislation."  *Safe Air for*

25  *Everyone v. Idaho*, 469 F. Supp. 2d 884, 892 (D. Idaho 2006).

26          Driving is an essential eligibility requirement to being a taxi medallion holder in San

27  Francisco.  Because they are unable to drive, Plaintiffs cannot meet the essential eligibility

28  requirement.  And their requested accommodation would be an unreasonable modification because it

would fundamentally alter the nature of the City's program.  Accordingly, Plaintiffs are not "qualified individuals" under the ADA and cannot succeed on their claim as a matter of law.

<strong>CONCLUSION</strong>

The Court should grant summary judgment in favor of the City.

Dated:  February 15, 2008

> DENNIS J. HERRERA
> City Attorney
> WAYNE SNODGRASS
> VINCE CHHABRIA
> FRANCESCA GESSNER
> Deputy City Attorneys
>
> By:_____/s/_____
> FRANCESCA GESSNER
> Attorneys for Defendants TAXI COMMISSION and
> CITY AND COUNTY OF SAN FRANCISCO