1  Joseph M. Breall, Esq. (SBN 124329)
   BREALL & BREALL, LLP
2  1255 Post Street, Suite 800
   San Francisco, California 94109
3  Telephone: (415) 345-0545
   Facsimile: (415) 345-0538
4  e-mail: jmbreall@breallaw.com

5  Elliott A. Myles, Esq. (SBN 127712)
   MYLES LAW FIRM, INC.
6  P.O. Box 11094
   Oakland, CA 94611
7  Tel: (510) 986-0877
   Fax: (510) 986-0843
8  email: elliott@myleslawfirm.com

9  Attorneys for Plaintiffs
   WILLIAM SLONE and MICHAEL MERRITHEW
10

11          THE UNITED STATES DISTRICT COURT FOR THE

12             NORTHERN DISTRICT OF CALIFORNIA

13                  SAN FRANCISCO DIVISION

14

15  WILLIAM SLONE and MICHAEL           CASE NO. C07-3335 JSW
    MERRITHEW,
16                                      PLAINTIFFS' OPPOSITION TO
               Plaintiffs,              MOTION FOR PARTIAL SUMMARY
17                                      JUDGMENT OR, IN THE
         vs.                            ALTERNATIVE, FOR SUMMARY
18                                      JUDGMENT, AND CROSS-MOTION
    TAXI COMMISSION, CITY AND COUNTY    FOR SUMMARY JUDGMENT.
19  OF SAN FRANCISCO, etc., et al.,
                                        HEARING DATE: April 4, 2008
20             Defendants.              TIME: 9:00 a.m.
                                        PLACE: Courtroom 2, 17th Floor
21

22

23

24

Plaintiffs Opposition and Cross-Motion for Summary Judgment                 Page 1
USDC No. C07-3335 JSW

1

## <u>TABLE OF CONTENTS</u>

2

3  TABLE OF AUTHORITIES................................................................................ii

4  SUMMARY OF ARGUMENT........................................................................2

5  OVERVIEW...............................................................................................3

6  LEGAL STANDARD OF REVIEW.................................................................6

7  LEGAL DISCUSSION.................................................................................6

8      A. Continuous Driving is Not Part of the Essential Nature Proposition K...................6

9          1. Standard of Review.....................................................................6

10          2. Review of the Language of Proposition K...........................................9

11              a. The Preamble and Section 1 Reiterate the Intent of Prop K...............9

12              b. Section 2 Requires an Intention to Drive at the Time of Applying for a
               Permit..........................................................................10

13              c. Section 3 Sets Out Facts to "Consider" in Issuing a Permit..............11

14              d. Section 4 Imposes a Continuous Operation Requirement on Permit
               Holders........................................................................11

15              e. Driving is not an Essential Eligibility Requirement of Prop K..........13

16      B. Ballot Augments and Analysis Do Not Support that a Driving Requirement was an

17        Essential Element of the Proposition K Program.......................................14

18      C. Defendants' Attempts to Circumvent the ADA..............................................16

19      D. ADA Accommodation is Not a Retirement Plan..........................................20

20      E. Plaintiffs Request for Accommodation Through Waiver and Yearly Review is

21        Reasonable and a Program Defendant Itself Proposed to Implement...................22

22  CONCLUSION..........................................................................................23

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Federal Cases**

*Alexander v. Choate*, 469 U.S. 287, 300-301 (1985)……………………………..…….7

*Black's Law Dictionary*, (5th Ed.), p. 1183……………………………………………....21

*Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492-493 (9th Cir. 1995)……………………………6

*Easley v. Snider*, 36 F.3d 297, 302 (3rd Cir. 1994)…………………………………….. 2, 6

*Franchise Tax Board v. Cory*, 80 Cal. App. 3d 772, 776 (Cal. App. 1978)…………………..20

*Hason v. Medical Board of California*, 279 F.3rd 1167 (9th Cir. 2002) …………………………4

*Hodges v. Superior Court* 21 Cal.4th 109, 114 (Cal. 1999)……………………………………7, 8

*Panzadides v. Virginia Board of Education*, 946 F.2d 345, 349-350 (4th Cir. 1991)……………..7

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 285 F.3d 1236 (9th Cir. 2002)………7

*People v. Furhrman*, 16 Cal. 4th 930, 937 (Cal. 1997)…………………………………..…..10

*PGA Tour, Inc. v. Martin*, 532 U.S. 661, 691 fn. 53 (2001). …………………………………..22

*Planned Parenthood Affiliates of California v. Swoap* , 173 Cal. App. 3d 1187 (Cal.App.1985)………………………………………………………………………………...8, 13

*Robert L. v. Superior Court*, 30 Cal. 4th 894, 899-900 (Cal. 2003)………………………………8

*San Francisco Taxpayers Assn. v. Board of Supervisors of CCSF*, 2 Cal. 4th 571, 577 (Cal.1992)… ………………………………………………………………………………...7

*School Board v. Arline*, 480 U.S. 273, 287-288 (1986)……………………………………………7

*Strathie v. Department of Transportation*, 716 F.2d 227, 231 (3rd Cir. 1983)………………….4

*Taxpayers to Limit Campaign Spending v. Fair Pol. Practices Comm.*, 51 Cal.3d 744, 764-765 (Cal. 1990)………………………………………………………………..…..8, 9

**Federal Statutes**
42 U.S.C.
    §§ 12101-12213………………………………………………………………………2
    § 12131(2)………………………………………………………………………4, 7

28 C.F.R.
    § 35.104...................................................................................................7
    § 35.130(b)(7)........................................................................................4, 7
F.R.C.P.
    56(c)........................................................................................................6

**San Francisco Statutes, Codes & Ordinances**
Admin. Code
    App. 6.....................................................................................................9
    App. 6, § 1..............................................................................................3
    App. 6, §§1(a)-(d)...........................................................................9, 11
    *App. 6, §2(a)*........................................................................................10
    App. 6, §2(b)...........................................................................................3
    App. 6, §2(f)..........................................................................................10
    App. 6, §3(d)...........................................................................................3
    App. 6, §4(a).................................................................................3, 11, 21

Municipal Code
    *MPC §1081(b)*......................................................................................4
    MPC § 1081(f)...................................................................................18, 19
    MPC §1082............................................................................................21
    MPC §1084............................................................................................21
    MPC §1088......................................................................................12, 21
    MPC §1090(a).....................................................................................2, 21
    MPC §1090(a)(i)....................................................................................16
    MPC §§1091-1094......................................................................12, 13, 21
    MPC §1095.....................................................................................13, 21
    *MPC §1096*..........................................................................................21
    *MPC §1096(a)*......................................................................................4
    MPC §§ 1096(a)- (c).............................................................................21
    *MPC §§ 1096(b), (c)*...........................................................................21
    MPC § 1096(c)......................................................................................12
    MPC §1124......................................................................................4, 13

Charter
    *§14.101*......................................................................................8, 9, 20

Police Code
    §1079...................................................................................................11

1

## I.    SUMMARY OF ARGUMENT

2      Defendants' motion is premised upon one argument – that a "continuous driving requirement"

3  is part of an essential eligibility requirement or part of the fundamental nature of the taxi permit

4  program of Proposition K ("Prop K"), the voter-passed initiative that governs taxicab permits in San

5  Francisco.[1] Accordingly, Defendants argue that the accommodation to the permit program sought by

6  Plaintiffs under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213,

7  would be unreasonable. The dominant issue the Court is presented with in these cross-motions for

8  summary judgment, therefore, is whether continuous driving is an essential eligibility requirement for

9  permit holders or part of the fundamental nature of the Prop K permit program.[2] If a continuous

10  driving requirement is not part of the Prop K permit program, the Plaintiffs are qualified and

11  Defendants are required to accommodate them. *Easley v. Snider*, 36 F.3d 297, 302 (3rd Cir. 1994).

12      Remarkably, in their motion, Defendants have not asked the Court to interpret Prop K to

13  determine if continuous driving is an essential element for Prop K permit holders. Instead, Defendants

14  ask the Court to accept their unilateral interpretation of Prop K by later ordinances and resolutions to

15  find that a continuous driving requirement is an essential element of the initiative. The law is clear –

16  Defendants' *post hoc* interpretation of Prop K, made over twenty years after the initiative was passed,

17  is not the test.

18      Instead, the Court must review the initiative itself and determine whether continuous driving

19  by a permit holder is an essential element of the Prop K program for permit holders. A review of the

20  initiative's clear and unambiguous language conclusively demonstrates that continuous driving does

21  not appear in Prop K, either as an essential eligibility requirement or as part of its fundamental nature.

22

23  [1] San Francisco Administrative Code, Appendix 6, *see* Defendants' Request for Judicial Notice, Exhibit A.
[2] Under Title II of the ADA, the determination of an "essential eligibility requirement" is relevant to whether a person is a
"qualified individual with a disability." 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104. The determination of a "fundamental
24  alteration" is relevant to whether a requested modification is reasonable. 28 C.F.R. § 35.130(b)(7).

1   While continuous driving may be a post-Prop K requirement imposed by Defendants on permit

2   holders, it is not and cannot be an essential eligibility requirement of Prop K or part of its fundamental

3   nature. Therefore, the driving requirement can and must be modified or waived under the ADA. The

4   accommodations sought by Plaintiffs – the modification or waiver of the continuous driving

5   requirement for disabled permit holders according to their disability subject to regular review – are *per*

6   *se* reasonable.

## II.   OVERVIEW

8         On June 6, 1978, San Francisco voters passed Prop K regulating the issuance of taxicab

9   permits (also called "medallions") by Defendants. Prop K, section 1, sets out the fundamental nature

10  of the initiative: "The qualified electors of … San Francisco hereby declare it shall be the law of …

11  San Francisco that …" *SF Admin. C., App. 6, § 1.* Section 1 further declares that all San Francisco

12  taxicab permits issued under Prop K are property of the people of San Francisco and cannot be sold,

13  assigned or transferred; that the Police Chief shall establish regulations to assure prompt, courteous

14  and honest service to the riding public; that the taxicab business shall operate under principles of free

15  enterprise; and that the Police Commission shall issue sufficient permits to assure adequate service. *Id.*

16        In the pursuit of this fundamental nature, Prop K requires each applicant for a permit to declare

17  under penalty of perjury "his or her intention actively and personally to engage as a permittee driver

18  under any permit issued to him or her for at least four hours during any 24 hour period on at least 75

19  percent of the business days during the calendar year." *SF Admin. C., App. 6, §2(b).* This "pledge" is

20  one of several facts that the Taxi Commission must take into effect in deciding whether to issue a

21  permit. *SF Admin. C., App. 6, §3(d).* Once an applicant obtains a permit, Prop K requires the permit

22  holder to "regularly and daily operate the taxicab or other motor vehicle for hire." *SF Admin. C., App.*

23  *6, §4(a).*

24

---

Plaintiffs Opposition and Cross-Motion for Summary Judgment
USDC No. C07-3335 JSW

1    The provisions of Prop K were codified in San Francisco Municipal Police Code ("MPC"),

2  Article 16.[3] Prior to 2004, the MPC followed Prop K by requiring applicants to make a fulltime-

3  driving pledge (*MPC §1081(b))*, and by requiring permit holders to "regularly and daily operate or

4  arrange for the operation of their motor vehicle for hire" (*MPC §1096(a)*).

5    Defendants do not contest that Plaintiffs qualified to hold Prop K permits, were issued such

6  permits and prior to their disability were full time taxicab drivers.

7    In 1990, Congress passed Title II of the ADA, which contains a sweeping prohibition of

8  practices by public entities that discriminate against qualified persons with disabilities. A "qualified

9  person with disabilities" is a disabled individual who, with or without reasonable accommodation,

10  "meets the essential eligibility requirements for the receipt of services or the participation in programs

11  or activities provided by a public entity." 42 U.S.C. § 12131(2). A public entity must make reasonable

12  modifications in their policies, practices or procedures when the modification is necessary to avoid

13  disability discrimination against a qualified person with a disability unless the entity can show that the

14  modification would fundamentally alter the program. 28 C.F.R. § 35.130(b)(7). Granting licenses or

15  permits is clearly a program affected by the ADA. *Hason v. Medical Board of California*, 279 F.3[rd]

16  1167 (9th Cir. 2002) (medical license); *Strathie v. Department of Transportation*, 716 F.2d 227, 231

17  (3rd Cir. 1983) (bus driver's license).

18    The ADA works harmoniously with Prop K. An applicant who satisfies the full-time driving

19  pledge of Prop K § 2(b), can obtain a permit. The permit holder is then required to regularly and daily

20  operate his or her taxi under Prop K § 4(a). Daily operation could either be direct or through an

21  approved lease under MPC §1124. If the permit holder becomes disabled after receiving the permit,

22  the permit holder can still satisfy the fundamental nature of Prop K § 4 by arranging for the regular

23  and daily operation of his or her taxi, even though he or she cannot drive the taxi personally. If the

24  ―――――――――――――
[3] Defendants' Request for Judicial Notice, Exhibit D.

1    permit holder is unable to arrange for the operation of the taxi, the permit holder can apply for a 90-

2    day suspension of his or her business under the permit under Prop K § 4(a). However, if the permit

3    holder suspends his or her business for more than 90 days, the permit may be revoked.

4        Subsequent interpretations of Prop K by Defendants have created an artificial tension between

5    Prop K and the ADA. In February 2002, the Taxi Commission adopted a procedure for reviewing and

6    granting ADA accommodation requests by permit holders. *SFTC "Processing a Request Under the*

7    *Americans with Disabilities Act."*[4] Other than restating general ADA requirements in Section II, this

8    procedure did not define the types of modifications the Taxi Commission could grant.

9        In October 2002, the Taxi Commission adopted a resolution stating that driving was more than

10   just a pledge required for each Prop-K permit applicant, but was also an essential eligibility

11   requirement for permit holders. *Taxi Commission Resolution 2002-93.*[5] For the first time, over 24

12   years after Prop K was passed, the Taxi Commission adopted the phrase "continuous driving," a

13   phrase that does not appear in Prop K. Relying on Resolution 2002-93, Defendants determined that the

14   continuous driving requirement could not be waived or modified for disabled permit holders,

15   regardless of whether they could still satisfy the continuous operation requirement of Prop K § 4.

16       Concurrently and throughout the following year, the Taxi Commission's Executive Director

17   began developing an ADA policy which would allow a waiver or reduction of the continuous driving

18   requirement depending on the severity of an individual permit holder's disability. The policy was

19   somewhat similar to the "City's catastrophic illness program for City employees," and provided that a

20   "disabled permit holder may apply for a waiver or reduction of the driving requirement, and waiver or

21   reduction, in appropriate cases, maybe renewed on a yearly basis." *Deposition of Naomi Kelly*, Ex. 20.

22   This policy remained a policy of the Executive Director until 2006.

23   _____

     [4] Defendants' Request for Judicial Notice, Exhibit H.
24   [5] Defendants' Request for Judicial Notice, Exhibit K.

1    In March 2006, Defendants reversed the Executive Director's ADA policy and adopted

2  Resolution 2006-28.[6] The Taxi Commission reiterated its unilateral declaration that continuous driving

3  was an essential eligibility requirement of Prop K, and determined that modifications or waivers of the

4  continuous driving requirement can only be made for disabilities of 120 days or less in any one year

5  period or for "catastrophic recoverable illnesses" one year out of five. On its face, Resolution 2006-28

6  does not address physical or mental disabilities, whether temporary or permanent, of longer than 120

7  days duration and does not comply with the ADA. Defendants' position is that any other

8  accommodation would be unreasonable thereby forcing Plaintiffs to bring the present suit.

9                  ### III.    LEGAL STANDARD OF REVIEW

10    The Court is familiar with the standards applicable to summary judgment, which do not need to

11  be recited at length. Summary judgment is only proper when "the pleadings, depositions, answers to

12  interrogatories, and admissions on file, together with the affidavits, if any show that there is no

13  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

14  law. Fed.R.Civ.P. 56(c). The Court construes all evidence and reasonable inferences it creates in the

15  light most favorable to the non-moving party. *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492-493 (9th

16  Cir. 1995). Only if, viewing all the evidence in this manner, "no genuine issue as to any material fact"

17  exists, is the moving party entitled to summary judgment. Fed.R.Civ.P. 56(c).

18                   ### IV.    LEGAL DISCUSSION

19  **A.       Continuous Driving Is Not Part of the Essential Nature Proposition K**

20       **1.       Standard of Review**

21    To determine the cross-motions for summary judgment the Court must resolve the issue of

22  whether continuous driving, the so-called "driving requirement," is part of the essential nature of Prop

23  K. *Easley*, 36 F.3d at 302. Plaintiffs do not now contest that Defendants have made continuous driving

24  _____

[6] Defendants' Request for Judicial Notice, Exhibit N.

1    a requirement of the Prop K permit program. However, the relevant question is whether it is an

2    "essential eligibility requirement" of the initiative, such that its modification or waiver would

3    fundamentally alter the Prop K program. As set out herein, the answer to this question is "no."

4         The Court is required to carefully analyze the question of what constitutes an "essential

5    eligibility requirement." _School Board v. Arline_, 480 U.S. 273, 287-288 (1986). A public entity cannot

6    "merely mechanically invoke any set of requirements and pronounce the handicapped applicant or

7    prospective employee not otherwise qualified." _Panzadides v. Virginia Board of Education_, 946 F.2d

8    345, 349-350 (4th Cir. 1991). Instead, the Court must look behind the qualifications to determine if the

9    eligibility requirement is essential to the program. _Ibid._ A program eligibility requirement which could

10   discriminate against the disabled is essential only if the program's purposes could not be achieved

11   without the requirement. _Alexander v. Choate_, 469 U.S. 287, 300-301 (1985); _Panzadides_, 946 F.2d at

12   349.

13        Prop K was a voter passed initiative. Federal Courts analyzing a local ballot initiative construe

14   the provisions using rules of statutory construction as adopted by state courts. _Parents Involved in_

15   _Community Schools v. Seattle School Dist. No. 1_, 285 F.3d 1236 (9th Cir. 2002). "Ordinary principles

16   of interpretation" govern the interpretation of such initiatives. _San Francisco Taxpayers Assn. v. Board_

17   _of Supervisors of CCSF_, 2 Cal. 4th 571, 577 (Cal. 1992). In the case of a voter passed initiative, the

18   court cannot "properly interpret the measure in a way that the electorate did not contemplate." _Hodges_

19   _v. Superior Court_ 21 Cal. 4th 109, 114 (Cal. 1999). However, as with all other statutes, the court must

20   look first to the language of the initiative:

21        "In interpreting a voter initiative, we apply the same principles that govern statutory
         construction. Thus, 'we turn first to the language of the statute, giving the words their ordinary
22       meaning.' … When the language is ambiguous, 'we refer to other indicia of the voters' intent,
         particularly the analyses and arguments contained in the official ballot pamphlet.'"

23

24

---

1 | *Robert L. v. Superior Court*, 30 Cal. 4th 894, 899-900 (Cal. 2003) (citations and references omitted).

2 | Accordingly, if the initiative is **not** ambiguous, there is no reason to go behind its clear language.

3 | For example, in *Planned Parenthood Affiliates of California v. Swoap* , 173 Cal. App. 3d 1187

4 | (Cal. App. 1985), the California Legislature passed a conference bill that included a section not

5 | approved by the conference committee. The bill was signed into law with the unapproved section. The

6 | Supreme Court dismissed the plaintiff's argument that the section was erroneously enacted: "While

7 | certain legislative reports may be indicative of legislative intent [], 'they cannot be used to nullify the

8 | language of the statute as it was in fact enacted.' *Ibid.*, at 1193. In other words, the clear and

9 | unambiguous language of an initiative that has received the necessary approval of the voters cannot be

10 | impeached by extrinsic evidence.

11 | If an initiative is ambiguous, the Court can then go behind the language of the initiative, but

12 | not without caution. The "motive or purpose" of the drafters of an initiative "is not relevant to its

13 | construction," since the opinion of the drafters "does not represent the intent of the electorate," and a

14 | court "cannot say with assurance that the voters were aware of the drafters' intent." *Taxpayers to Limit*

15 | *Campaign Spending v. Fair Pol. Practices Comm.*, 51 Cal. 3d 744, 764-765 (Cal. 1990). Moreover,

16 | voters' pamphlets and other information behind the language of an initiative are "entitled only to as

17 | much deference as its logic and persuasiveness demand." *S.F. Taxpayers*, *id*. A ballot pamphlet is only

18 | relevant and persuasive if it takes "into account the most directly relevant provision" of the initiative.

19 | Without that nexus, it cannot be "helpful" and cannot be "conclusive in determining the probable

20 | meaning of initiative language." *S.F. Taxpayers*, *id*.

21 | Equally, under the governing law of the City and County of San Francisco, "[n]o initiative or

22 | declaration of policy approved by the voters shall be subject to veto, or to amendment or repeal except

23 | by the voters, unless such initiative or declaration of policy shall otherwise provide." *SF Charter,*

1   §14.101.[7] As a voter passed initiative, Proposition K can only be amended by the voters – any other

2   purported amendment is void.

3       Therefore, according to general principles of statutory interpretation, in addressing Defendants'

4   motion, this Court must begin and end with the language of Proposition K.

5       **2.     Review of the Language of Proposition K**

6       A review of Prop K conclusively demonstrates that a continuous driving requirement is not an

7   essential eligibility requirement of the permit holder's program.

8       **a.     The Preamble and Section 1 Reiterate the Intent of Prop K**

9       The Preamble of Prop K states, in part, that it is "[a]n Ordinance providing regulations, policies

10  and procedures relating to the issuance of permits for taxicabs . . . regulating the times for operation

11  under such permits, nontransferability of permits, surrender and exchange of existing permits:

12  provisions as to corporate permittees, financial and accounting records, and certain aspects of taxicab

13  rates ... ." *SF Admin. C., App. 6*. The Preamble does not contain any requirement that permit holders

14  must continuously and personally drive their taxicabs.

15      Prop K § 1 declares the voters' four-fold intent in enacting Proposition K: (1) that permits may

16  not be sold; (2) that the Chief of Police (now Taxi Commission) shall ensure prompt, courteous and

17  honest public service by regulations; (3) that permit holders shall be free to operate their taxicab

18  businesses and to compete under the principles of free enterprise; and (4) that sufficient permits shall

19  be issued to assure adequate service. *SF Admin. C., App. 6, §§1(a)-(d)*. Section 1 does not impose a

20  continuous driving requirement on permit holders.

21      The words "drive," "driver," or "driving" do not appear in either the Preamble or Section 1.

22  Nothing in the Preamble or Section 1 suggests that the voters intended to make continuous driving or a

23  driving requirement an essential part of the nature of the program.

24  ---
    [7] Plaintiffs Request for Judicial Notice, Exhibit B.

---

1

        **b.**    **Section 2 Requires an Intention to Drive at the Time of**
               **Applying for a Permit**

2

3          Prop K § 2 is entitled "The Application for A Permit." This section is of limited application. It

4  only applies to a specific class of applicants for taxi permits, and does not apply to pre-Prop K permit

5  holders who surrender their permits for reissuance under Prop K § 4(b). *SF Admin. C., App. 6, §2(f)*.

6          Section 2 refers to applications for permits "to operate" a taxi cab, not to "drive" a taxi: "[a]ny

7  applicant for a permit to operate a taxicab …" *SF Admin. C., App. 6, §2(a)*. In fact, Section 2 uses the

8  word "drive," "driver," "driving," etc. only twice. In Section 2(b), an applicant is required to "declare

9  under penalty of perjury his or her intention actively and personally to engage as a permit driver under

10  any permit issued to him or her …" for four hours in every 24, or 75% of the business days in a

11  calendar year. Section 2(c) creates a limited preference for issuing a permit to "any person who has

12  driven a taxicab." This preference was actually limited on its face to the first two years from the

13  effective date of the ordinance, clearly indicating that continuous driving was not essential to the Prop

14  K program after the first two years of its enactment.

15          When statutory language is clear and unambiguous, there is no need for a construction and a

16  court should not indulge in it. The plain language of the statute establishes what was intended by the

17. voters. *People v. Furhrman*, 16 Cal. 4th 930, 937 (Cal. 1997). The language of Section 2 is clear and

18  unambiguous. It applies only to applicants for permits. It does not apply to individuals who have been

19  issued a permit. It does not require individuals who have been issued permits to "continuously drive"

20  throughout the life of the permit. It does not state that continuous driving is essential to the Prop K

21  program. It only requires applicants to pledge that, if granted a permit, they intend to be full time

22  drivers, and it gives current drivers a two-year preference for permit issuance.

23

24

1

         **c.**     **<u>Section 3 Sets out Facts to "Consider" in Issuing a Permit</u>**

2

     Prop K § 3 sets out four facts that the Taxi Commission must consider before issuing a permit.

3

*SF Admin. C., App. 6, §§ 3(a)-(d).* "Drive" is only mentioned once in this section. Section 3(d)

4

requires the Taxi Commission to consider whether "[t]he applicant will be a full time driver, within the

5

meaning of Section 2(b) of this Ordinance" before issuing the applicant a permit.

6

     Again, the language of Section 3 is clear and unambiguous. Section 3 allows the Taxi

7

Commission to consider the validity of the applicant's full-time driving pledge in issuing a permit.

8

However, Section 3 does not give the Taxi Commission the duty to enforce a continuous driving

9

requirement for the life of the permit.

10

         **d.**     **Section 4 Imposes a Continuous Operation Requirement on Permit Holders**

11

12

     Finally, Prop K § 4, requires permit holders to "regularly and daily operate continuously their

taxicab ... during each day of the year to the extent reasonably necessary to meet the public demand

13

for such taxicab ..." *SF Admin. C, App. 6, §4(a).* Section 4 does not use the words "drive," "driver,"

14

"driving," etc. It only creates an essential eligibility requirement for permit holders of continuous

15

operation.

16

     Section 4(a) also re-enacts a pre-Prop K abandonment/suspension rule. A permit holder who

17

abandons his or her "business" for 10 consecutive days may have their permit revoked. However, the

18

permit holder can obtain permission to "suspend operation pursuant to such permit" for up to 90 days

19

each calendar year "in case of sickness, death, or other similar hardship." This language parallels the

20

1976 San Francisco Police Code, Section 1079.[8]

21

     The 10/90 abandonment-suspension rule is equally applicable to pre-Prop K and Prop K permit

22

holders. The 10/90 abandonment-suspension rule pertains to the operation of the permit holder's

23

---

24

[8] Plaintiffs' Request For Judicial Notice, Exhibit C

business as a permit holder as a whole. As explained by the Taxi Commission's current ADA Coordinator, the rule is not directed to a permit holder's disability:

> "Q. Just one more question. Looking at Exhibit 24, are the first two bullet points, the 120-day maximum leave per year and then the full-year exemption once per five years for treatment of a catastrophic, recoverable illness, are those the only two types of accommodations that the commission offers for the driving requirement?
>
> "A. Under ADA, yes.
>
> "Q. And there are no other types that the commission currently offers?
>
> "A. There is a separate accommodation, but not under ADA, and that's for a 90-day leave, a request for a 90-day leave that some applicants may have applied for."

*Deposition of Tamara Odisho*, p. 80, lines 2-14.

> "Q. I believe you said that the 90-day leave period is a separate accommodation not under ADA, right?
>
> "A. Yes. It's under the MPC, Municipal Police Code."

*Deposition of Tamara Odisho*, p. 82, lines 22-25.

Like Sections 1 through 3, the language of Section 4 is clear and unambiguous. For persons who have received a permit under Prop K, the fundamental nature of the program is "continuous operation." As recognized by the Taxi Commission's current President, "operation" is not the same as and constitutes more than "driving":

> "Q. So operation encompasses more than just driving?
>
> "A. Yes."

*Deposition of Paul Gillespie*, p. 75, line 25, p. 76, line 1.    In fact, "operation" includes the whole business of the permit (MPC § 1096(c)), including annual fees (MPC § 1088); criminal prohibitions (MPC § 1090(a)); insurance requirements (MPC §§ 1091-1094); record keeping (MPC § 1095), etc.; either directly or under an approved lease (MPC § 1124).

Under the clear and unambiguous language of Section 4, a permit holder who, because of a disability cannot personally drive his or her taxi, can theoretically continue to operate continuously or arrange for the continuous operation of his or her permit. The only restriction to the permit holder continuing to operate his or her permit is the "driving" or "continuous driving" requirement adopted by Defendants in Resolution 2002-93, 24 years after Prop K was passed, and Resolution 2006-28, 28 years after Prop K was passed. Although this requirement may apply to other permit holders, the ADA requires its reduction or waiver for permit holders with *bona fide* disabilities.

### e.    Driving is not an Essential Eligibility Requirement of Prop K

In summary, the word "drive" in any of its uses, let alone "continuous driving," is only mentioned in twice in Prop K, both times in relation to the requirements for applying and issuing a permit. It is not mentioned in Section 4 with respect to persons who have received a permit.

The language of Proposition K is clear and unambiguous, and therefore, there is no reason for the court to go behind its language. To paraphrase the court in *Planned Parenthood*, "Proposition K which has received the necessary approval of the voters of the City and County of San Francisco cannot be impeached by extrinsic evidence that it does not genuinely reflect the will of the people of San Francisco." Accordingly,

> "confronted with an ambiguous statute in need of interpretation, defendants are not genuinely asking the court to construe the words of [the initiative] but to add their own words. This the Court cannot do."

*Planned Parenthood*, 173 Cal. App. 3d at 1193.

Under the clear, unambiguous, simple language of Prop K, a "continuous driving requirement" is **not** an essential eligibility requirement of maintaining a permit, either under Section 4 specifically or under Prop K in general.

---

**B.    Ballot Augments and Analysis Do Not Support that a Driving
Requirement was An Essential Element of the Proposition K Program**

Although Prop K is clear and unambiguous on its face, Defendants argue that ballot arguments support a driving requirement as an essential element of the program. This is not the case. Neither the neutral analysis nor the paid arguments in support of Prop K suggest that a continuous driving requirement is an essential part of the initiative. Instead, the ballot arguments refer to the three essential parts of the initiative: (1) the elimination of corporate ownership of permits; (2) the elimination of the transferability (and thus the marketability) of taxicab permits; and (3) the allowance of individuals with a history of working as taxicab drivers to obtain permits.

The neutral "Analysis" in the June 1978 Voters Pamphlet[9] explains the initiative and its key components. It does not in any manner designate a continuous driving requirement as an essential element of the proposed initiative. The Analysis states:

> "THE WAY IT IS NOW: New taxicab permits are only issued when the Police Commission says they are needed. The fee to the city for a new permit is $7500. Permits may also be freely sold from one person to another for whatever price they agree upon. Today permits sell privately for over $10,000 apiece because over 700 permits are out and no new permits are being issued. If one party buys a taxicab permit from another party, a transfer fee of $1000 must be paid to the city.

> "THE PROPOSAL: Proposition K would change the way taxicab permits are issued and prevent them from being transferred from one party to another. The Police Commission would set the amount of permit fee and hold hearings on applications for permits. New permits would be required for all taxicabs, including those now being operated under old permits. Present owners would have preference for new permits, but they would have to exchange their permits within 60 days. No permits could be bought or sold privately. They would belong to the City and County. Preference for completely new permits would go to anyone who has been a taxicab driver for one straight year within the past three years. Once present permit holders have exchanged their permits, new permits would only be issued to individuals, not companies. The permit could be revoked if more than 10 percent of a taxicab company's stock is sold or transferred. Owners would also be required to keep specific financial records.

---

[9] Defendants' Requests for Judicial Notice, Exhibit C.

"A YES VOTE MEANS: If you vote yes, you do not want taxicab permits to be sold on the open market and you want to phase out ownership by companies.

"A NO VOTE MEANS: If you vote no, you either want the taxicab permit rules to stay the way they are now, or you want to change them in some other way."

"Drive" is only used to refer to the sunset preference in Prop K § 2(c).

Similarly, the paid argument in support of Proposition K does not suggest that a continual driving requirement is an essential element of the program:

"Our taxicab system must be reformed. Proposition K allows the cab business to operate under principles of free enterprise and to charge less than the maximum fare. It prevents a favored few from making big profits on taxi permits which belong to the people of San Francisco, and requires the Police Commission to issue enough permits to ensure adequate cab service throughout San Francisco and prompt, courteous and honest treatment of the consumer.

"Proposition K is consumer legislation. It gives you, the voter, a chance to say whether the cab business should be opened up to stop favored taxicab companies and individuals from buying and selling cab permits for profit and practicing unfair competition.

"Since 1972, there have been efforts to halt the private peddling of City cab permits. Under the initiative, individuals who now own taxi permits can retain them, but those who obtain permits with the sole purpose of reselling them for an enormous profit could not do so. When unused, the permits would return to the Police Commission where new permits would be issued to people who actually want to drive a cab.

"Who gets hurt by the present system? Not the major taxicab companies, but the paying consumer and the individual taxicab driver who wants to obtain a permit and be allowed to engage in the taxicab business himself. Now taxicab drivers must pay a tremendous percentage of their daily receipts for permits which cost $12,000 to $30,000 or more. The result is higher fares which adversely affect all customers, especially those least able to pay.

"Free enterprise principles and non-transferable taxicab permits will provide an equitable arrangement for the public and for cab drivers who want to serve all San Franciscans. STOP THE PROFITEERING – VOTE "YES" ON PROPOSITION 'K'."

This argument condemns the reselling of unused permits for hire. The Paid Argument does not define "use" to mean "drive." It does not address the ability of permit holders who are disabled but still able to operate their permits to continue to operate, and therefore continue to use, their permits.

---

1    Neither the analysis nor the arguments in the voter's pamphlet support Defendants contention

2    that a continuous driving requirement is an essential element to the Prop K. Therefore, continuous

3    driving for permit holders can be modified or waived under the ADA without fundamentally altering

4    the permit holders program.

5    **C.    Defendants' Attempts To Circumvent the ADA**

6    Although Prop K does not enact a continuous driving requirement for permit holders, in 1988,

7    the MPC was amended to provide that a permit holder's permit must be revoked if the permit holder

8    ceases to be a full time driver. MPC § 1090(a)(i). At the same time, Defendants reenacted a driving

9    preference to replace the sunset preference in Prop K § 2(d). MPC § 1121(c).

10   In August 1999, City attorney Tom Owen gave his opinion regarding the Prop K "driving

11   requirement" without, however, referring to Prop K § 4. *Memorandum, August 5, 1999.*[10] He simply

12   assumed under Sections 2(b) and 3(d), that Prop K "imposes a driving requirement on permit holders."

13   *1999 Memorandum, p. 3, §2.* However, Mr. Owen also stated that the memorandum "does not address

14   the separate question of what accommodations the City must make under the [ADA] disabled permit

15   holders. *1999 Memorandum, pp. 4-5.* The Taxi Commission took no formal action regarding this

16   memorandum. *Declaration of Paul Gillespie, §6, lines 2-3; §7, lines 11-13.*

17   In April 2000, City attorney Owen gave a follow-up opinion, relating the driving requirement

18   to the ADA. *Memorandum, April 24, 2000.*[11] Again, he misstates Prop K by stating that the full-time

19   driving requirement of Section 2(b) applies to permit holders, and again, without citing Section 4 or

20   other authority. However, after recognizing that Prop K can only be amended by the voters

21   (*Memorandum, p. 2, 1st paragraph*), Mr. Owen recognized that Defendants had the "separate and

22

23

---

24   [10] Defendants Requests for Judicial Notice, Exhibit J.
     [11] Plaintiffs' Requests for Judicial Notice, Exhibit A.

1    independent obligation" to comply with the ADA which might "mean disregarding or not enforcing all

2    or part of a voter-approved initiative ordinance." *Memorandum, p. 2, 2nd paragraph.*

3        More importantly, Mr. Owen states:

4        "We emphasize that no determination has been made at this point that the enforcement of
         the driving requirement for permit-holders conflicts with the ADA. **The Commission**

5        **may decide that being a full-time driver is an essential eligibility requirement for**
         **permit-holders under Proposition K and that full or partial waiver of the**

6        **requirement would fundamentally alter the program.** Those determinations will have
         to be made as the Taxi Commission develops its ADA policies and identifies what

7        modifications of the driving requirement, if any, would be a reasonable accommodation
         for particular disabled individuals." (emphasis added).

8    *Memorandum, p. 2, 2nd paragraph.* Based on this comment, as of April 25, 2000, the City Attorney

9    recognized that a driving requirement was **not** an essential eligibility requirement for Prop K permit

10   holders. Under the Charter, Defendants cannot now unilaterally "decide" that such a requirement was

11   part of the voter-approved initiative.

12       In February 2002, Defendants adopted a procedure for approving requests for accommodations

13   under the ADA, which, however, did not define what specific modifications or accommodations could

14   be made. *SFTC "Processing a Request."*

15       Eight months later, in an attempt to circumvent the application of the ADA, the Taxi

16   Commission attempted for the first time to implement formally a continuous driving requirement as an

17   essential eligibility requirement for permit holders. *Resolution 2002-93.* This Resolution recognizes

18   that a driving requirement was not an essential eligibility requirement of Prop K, instead stating that

19   Prop K "indicates the importance that measure places on permitholders driving on a continuous basis,"

20   and that "this Commission" – **notably not the voters of San Francisco** – "has recognized that a basic

21   principle central to Proposition K is that permitholders be full-time drivers rather than absentees." The

22   Resolution concludes that continuous driving is an essential eligibility requirement of the taxi program

23   and an "exemption" from that requirement would fundamentally alter the nature of the program. In

24

---

1   direct opposition to the sweeping reform of the ADA, the Resolution reserved to the Tax Commission

2   the "discretion in determining what sanction or sanctions may be appropriate to impose on a disabled

3   permitholder who does not meet Proposition K's continuous driving requirement."[12]

4       The Resolution was understood by the Taxi Commission's Executive Director to have created

5   an essential eligibility requirement where none existed before:

6       "Q. What I understood you to say was that the driving -- that resolution 2002-3 [sic] was
        an attempt to give the commission more leeway in interpreting the driving requirement
7       and dealing with the driving requirement, as opposed to the formulaic dictates of Prop K?

8       "A. No. This resolution specifically dealt with the essential eligibility requirement of the
        City's taxi permitting programs.

9
    *Deposition of Naomi Kelly*, p. 41, lines 5-13.
10
        "Q. Okay. So, in essence, what you're saying to me is, your understanding of this
11      [Resolution 2002-93] is this was simply just sort of a reaffirmation of Prop K?

12      "A. No. It was to determine again the essential eligibility requirement and consider the
        continuous driving requirement as an essential eligibility requirement and give more
13      direction to the staff on what would be a reasonable accommodation."

14  *Deposition of Naomi Kelly*, p. 42, lines 3-10.

15      In 2004, the City adopted legislation clearly applying a full-time driving requirement for

16  permit holders. *SF Board of Supervisors File No. 040343.*[13] Under MPC § 1081(f) adopted in 2004, a

17  permit holder must be a full time driver for the year when his or her permit is first granted and for the

18  next following year.

19      The 2004 legislation demonstrates two important points. First, this legislation affirmatively

20  demonstrated that "driving" or "continuous driving" was not an essential eligibility requirement under

21  Prop K for permit holders. To hold otherwise would mean that the 2004 legislation was unnecessary.

22  _____
    [12] Defendants disingenuously cite the voter's rejection of Proposition N as another basis for its position that they do not
    have to provide the accommodation sought by Plaintiffs. Defendant is well aware that the city electorate cannot "vote" to
23  disregard Federal law. Moreover, Defendants took no formal action regarding the rejection of Proposition N. *Deposition of
    Paul Gillespie*, p. 154, line 10-25; *and see* San Francisco City Charter §4.104(b) (Commissions act through a majority
    vote).
24  [13] Defendants' Request for Judicial Notice, Exhibit E.

1    Second, the 2004 legislation only makes full time driving a two-year requirement. MPC § 1081(f) does

2    not extend the driving requirement to the full term of the permit.

3        Finally, in March 2006, the Taxi Commission reiterated its position that "continuous driving"

4    is an essential eligibility requirement of the Prop K program as applied to permit holders. *Resolution*

5    *2006-28.* Accordingly, the Taxi Commission adopted two accommodations for permit holders: one a

6    modification of the driving requirement for up to 120 days in one year; the second for up to one year

7    in five for individuals with catastrophic recoverable illnesses. Remarkably, the Taxi Commission

8    President does not know how these accommodations are intended to work, nor how the "120 day out

9    of one year for three years" or "one year in five formulae" were chosen:

10       "Q. So I'm wondering, when you adopted this policy, how did you see this policy to
         work?

11

12       "A. That it was a reduction in the driving requirement, but not elimination based on a
         limited -- some limited accommodation.

13       "Q. And what is that limited accommodation?

14       "A. That's what's been adopted by this. It's essentially a third or -- again, I don't know
         how the mathematics was done. I don't know how it was actually implemented by our

15       staff.

16       "Q. Prior to adopting the policy, were you explained how the mathematics would be
         done? Were you told how the mathematics would be done?

17       "A. No."

18

19    *Deposition of Paul Gillespie*, p. 97, lines 22-25; p. 98, lines 1-10.

20        In this lawsuit, Plaintiffs do not contend that these resolutions and ordinances are

21    unenforceable, or that, absent the question of disability, all permit holders must comply with these

22    laws. Instead, Plaintiffs simply contend that as after-adopted, non-voter passed legislation, these

23

24

1   resolutions and ordinances do not and cannot amend Prop K to make "driving" or "continuous

2   driving" an essential eligibility requirement for permit holders.

3        Section 14.101 of the Charter of the City and County of San Francisco states that "[n]o

4   initiative or declaration of policy approved by the voters shall be subject to veto, or to amendment or

5   repeal except by the voters, unless such initiative or declaration of policy shall otherwise provide."[14]

6   "Amendment" includes any change in the scope or effect of an initiative either by addition or

7   subtraction, whether the change conflicts with existing law or not. *Franchise Tax Board v. Cory*, 80

8   Cal. App. 3d 772, 776 (Cal. App. 1978).

9        Prop K has not been vetoed, amended or repealed by the voters. As established above, Prop K

10  does not enact continuous driving as an essential eligibility requirement of the permit holder program

11  established under the initiative. Subsequent ordinances and resolutions not approved by the voters

12  cannot amend Prop K by adding continuous driving to the permit holder program. Accordingly, a

13  driving requirement, whether continuous driving under the Taxi Commission's resolutions or full time

14  driving under the MPC, is not an essential eligibility requirement for permit holders under Prop K. It

15  can and must be modified or waived under the ADA with respect to permit holders with *bona fide*

16  disabilities.

17  **D.    ADA Accommodation is Not a Retirement Plan**

18       Defendants arguments and part of Paul Gillespie's declaration in support of Defendants'

19  arguments state that accommodating ADA requests beyond the limits of Resolution 2006-28 would

20  create a retirement plan for disabled permit holders. This is nonsense.

21       Plaintiffs seek an order forcing Defendants' to adopt an ADA policy that matches a disabled

22  permit holder's disability with a modification or waiver of the driving requirement so long as the

23  disabled permit holder can continue to operate or arrange for the operation of his or her taxi and

24  [14] Plaintiffs' Request for Judicial Notice, Exhibit B.

comply with all other relevant sections of the MPC. Prop K § 4 adopts continuous operation as part of the permit holder's business. If the permit holder abandons his or her business for 10 consecutive days without permission, the permit is subject to revocation. If the permit holder cannot operate his or her business for more than 90 days in a calendar year because of "sickness, death, or other similar hardship," the permit is subject to revocation. Otherwise, as long as the permit holder continues to operate his or her taxi business, the permit is not subject to revocation.

If Plaintiffs' policy is adopted, a permit holder who cannot drive personally because of a disability must still comply with all other requirements of the MPC. For example, the permit holder can only hold one permit (MPC § 1082); cannot sell or transfer a permit, inter vivos or after death (MPC § 1084); must pay the annual permit fees (MPC § 1088); must not knowingly make false statements to the Police Department or Taxi Commission, be convicted of a crime involving moral turpitude, fail to satisfy any judgment arising from the operation of the permit, be convicted of a misdemeanor, etc. (MPC § 1090(a)); must provide for insurance for the taxi (MPC §§ 1091-1094); must keep all required financial information (MPC § 1095); must ensure the taxi is operated safely and cleanly (MPC §1096); and so on. The disabled permit holder cannot abandon his business for more than 10 consecutive days without obtaining permission for up to a 90 day suspension, and cannot abandon his business for more than 90 days in any one calendar year. *SF Admin.C., App. 6, §4(a); MPC §§ 1096(b), (c).*

Simply stated, a waiver or modification of the driving requirement does not excuse the permit holder from continuing to operate his taxi business.

On the other hand, retirement implies the termination of the business on reaching a certain age. See *Black's Law Dictionary*, (5th Ed.), p. 1183. If a permit holder retires, in other words, if the permit holder terminates his taxi business by no longer continuing to operate the permit, the permit is subject

1  to revocation. *See* MPC §§ 1096(a)-(c). Both a healthy permit holder and a disabled permit holder

2  operating under an accommodation can decide to retire. Defendant cannot use the specter of

3  "retirement" to avoid the application of the ADA to disabled permit holders.

4  **E.    Plaintiffs Request for Accommodation through Waiver and Yearly
       <u>Review is Reasonable and A Program Defendant Itself Proposed to Implement</u>**

5

6      A "continuous driving requirement" is not an essential eligibility requirement of Prop K for

7  permit holders. Defendants are therefore required to reduce or waive the "driving" and "continuous

8  driving" requirement for permit holders who become disabled, unless such a reduction or waiver

9  would be unreasonable. 28 C.F.R. § 35.130(b)(7).

10     In February 2002, the Taxi Commission adopted standards for what is "reasonable":

11     "A requested modification that poses a threat to the safety of the permitholder or the
       public is not reasonable. A requested modification is unreasonable if it is unduly costly or

12     its implementation would be unduly disruptive."

13  *Processing a Request, Section II, 1ˢᵗ paragraph.* "

14     Undue cost" or "undue disruption" is not the same as cost or difficulty in administration

15  because a permit holder's disability will have to be re-evaluated on a yearly basis: "Nowhere in §

16  12182(b)(2)(A)(ii) does Congress limit the reasonable modification requirement only to requests that

17  are easy to evaluate." <u>*PGA Tour, Inc. v. Martin*</u>, 532 U.S. 661, 691 fn. 53 (2001).

18     The Plaintiff's request for waiver of driving with a yearly review is actually a program that was

19  proposed by Defendants through the Taxi Commission Executive Director. Throughout 2002 and

20  2003, then Executive Director Naomi Kelly was working with the problem of the ADA and the driving

21  requirement. <u>*Deposition of Naomi Kelly*</u>, p. 23, lines 14-17; p. 53, lines 3-10; pp. 55-56, lines 22-11.

22  The policy developed by Ms. Kelly is set out in a memorandum to Supervisor Jake McGoldrick.

23  <u>*Deposition of Naomi Kelly*</u>, pp. 57-58, lines 17-7; Ex. 20. Both Ms. Kelly and the City's director of the

24

1    Department of Public Health, Mitchell Katz, testified before the Taxi Commission regarding Ms.

2    Kelly's policy. *Deposition of Naomi Kelly*, pp. 65, line 2 – 68, line 11.

3        The policy developed by Ms. Kelly states:

4        "Proposition K already allows the Taxi Commission to waive the driving requirement for
         a permit holder who becomes partially or temporarily disabled. However, for a permit

5        holders who are permanently disabled, the Taxi Commission and the DPH are developing
         an ADA accommodation program that is somewhat similar to the City's catastrophic

6        illness program for City employees in how it handles long-term or ongoing conditions. A
         disabled permit holder may apply for a waiver or reduction of the driving requirement,

7        and waiver or reduction, in appropriate cases, maybe renewed on a yearly basis."

8    *Deposition of Naomi Kelly*, Ex. 20.

9        Although Ms. Kelly had reservations about perpetual, repeated waivers (*Deposition of Naomi*

10   *Kelly*, p. 55, lines 7-14), she believed that the policy could be implemented (*Deposition of Naomi*

11   *Kelly*, p. 64, lines 11-17). Unfortunately, her policy was not implemented by Defendants. *Deposition*

12   *of Naomi Kelly*, p. 64, lines 4-5. If it had been, this lawsuit may not have been filed.

13       Ms. Kelly's policy was proposed under the assumption that a driving requirement was an

14   essential eligibility requirement for Prop K permit holders under Resolution 2002-93. Nevertheless,

15   she believed that her proposal complied with both Prop K and the Resolution.

16       However, as set forth above, Resolution 2002-93 was incapable of amending Prop K, and Prop

17   K contains no driving requirement for permit holders. Accordingly, there are no legal barriers to

18   adopting Ms. Kelly's proposal.

19                              V.    **CONCLUSION**

20       Defendants cannot maintain that a continuous driving requirement was an essential element of

21   Prop K or that it is an essential eligibility requirement that would make the accommodation sought by

22   Plaintiffs unreasonable. Therefore, Plaintiffs' accommodation request is reasonable and required under

23   the ADA. In fact, Plaintiffs request is identical to a program that the defendant's proposed and sought

24

1  to implement. In light of the above the Court must deny defendant's motion for summary judgment

2  and grant plaintiffs' cross-motion for summary judgment.

3          Respectfully submitted,

4  DATED: February 29, 2008                    BREALL & BREALL, LLP
                                               THE MYLES LAW FIRM, INC.

5

6

7                              By: _____

8                                  JOSEPH M. BREALL, ESQ.
                                   ELLIOTT A. MYLES, ESQ.
9                                  Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**PROOF OF SERVICE**

C.C.P. § 1985(b)(e)

    I, the undersigned, declare that I am over the age of eighteen years and am not a party to the within-entitled action; I am employed in the County of San Francisco, California; my business address is 1255 Post Street, Suite 800, San Francisco, CA 94109.

On the below date I served the attached document(s) entitled
PLAINTIFFS OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT
PLAINTIFFS NOTICE OF CROSS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT
PLAINTIFFS REQUEST FOR JUDICIAL NOTICE
PLAINTIFFS OBJECTION TO DEFENDANTS REQUESTS FOR JUDICIAL NOTICE
PLAINTIFFS OBJECTION TO DECLARATION OF HEIDI MACHEN
PLAINTIFFS OBJECTION TO DECLARATION OF PAUL GILLESPIE
[PROPOSED] ORDER GRANTING DEFENDANTS MOTION FOR SUMMARY JUDGMENT
DECLARATION OF JOSEPH M. BREALL IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT
on all interested parties in said cause addressed as follows:

Francesca Gessner
Wayne Kessler Snodgrass
Vince Chhabria
San Francisco City Attorney's Office
City Hall, Room 324
1 Dr. Carlton B. Goodlett Place
San Francisco CA 94102

[X]   **(BY MAIL)** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the ordinary course of business for collection and mailing that same day at 1255 Post Street, suite 800, San Francisco, CA 94109. I declare that I am readily familiar with the business practice of Breall & Breall for collection and processing correspondence fro mailing with the United Sates Postal Service and that the correspondence would be deposited with the United Postal Service that same day in the ordinary course of business.

[ ]   **(BY FEDERAL EXPRESS)** by placing a true copy thereof enclosed in a sealed envelope for delivery via Federal Express to the addressee(s) noted above.

[ ]   **(BY FACSIMILE)** I served the foregoing documents on the interested party/parties in this action by facsimile transmission and the transmission was reported as completed without error to the office(s) with the following fax number: N/A . I attached to this proof of service the transmission report that was properly issued by the transmitting facsimile machine maintained by, Breall & Breall, 1255 Post Street, Suite 800, San Francisco, CA 94109.

1    [ ]    **(BY HAND DELIVERY)** by placing a true copy thereof enclosed in a sealed envelope for
2           delivery via hand delivery by calling such service as used in the ordinary course of business
           and instructing said business to deliver the above on this day to the address above.

3    Executed on February 29, 2007, at San Francisco, California.

4    [x]    **(State)** I declare under penalty of perjury under the laws of the State of California that the
5           above is true and correct.

6                                                        Marisa Phillips

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28