Joseph M. Breall, Esq. (SBN 124329)
BREALL & BREALL, LLP
1255 Post Street, Suite 800
San Francisco, California 94109
Telephone: (415) 345-0545
Facsimile: (415) 345-0538
e-mail: jmbreall@breallaw.com

Elliott A. Myles, Esq. (SBN 127712)
MYLES LAW FIRM, INC.
P.O. Box 11094
Oakland, CA 94611
Tel: (510) 986-0877
Fax: (510) 986-0843
email: elliott@myleslawfirm.com

Attorneys for Plaintiffs
WILLIAM SLONE and MICHAEL MERRITHEW

THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAM SLONE and MICHAEL MERRITHEW,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>TAXI COMMISSION, CITY AND COUNTY OF SAN FRANCISCO, etc., et al.,<br><br>                    Defendants. | CASE NO. C07-3335 JSW<br><br>DECLARATION OF JOSEPH M. BREALL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND CROSS-MOTION FOR SUMMARY JUDGMENT.<br><br>HEARING DATE: April 4, 2008<br>TIME: 9:00 a.m.<br>PLACE: Courtroom 2, 17th Floor |

I, Joseph M. Breall, declare as follows:

1.      I have personal knowledge of the matters stated herein, except for those matters set forth on information and belief, which I believe to be true, and if called to testify, I can and will testify competently as to all matters set forth herein.

2.      I am an attorney duly licensed to practice law in all courts in the State of California and am the attorney of record for the Plaintiffs William Slone and Michael Merrithew.

3.      Attached hereto as Exhibit A is a true and correct copy of excerpts of Tamara Odisho's deposition which was taken on January 31, 2008.

4.      Attached hereto as Exhibit B is a true and correct copy of excerpts of Robert Paul Gillespie's deposition which was taken on January 15, 2008.

5.      Attached hereto as Exhibit C is a true and correct copy of excerpts of Naomi Maria Kelly's deposition which was taken on January 24, 2008.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed in San Francisco, California, on February 27, 2008.



_____
JOSEPH M. BREALL, ESQ.

# Exhibit A

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | NORTHERN DISTRICT OF CALIFORNIA |
| 3 | SAN FRANCISCO DIVISION |

```
 4   WILLIAM SLOAN AND MICHAEL          )
     MERRITHEW,                         )        CERTIFIED
 5                                      )          COPY
             Plaintiffs,               )
 6                                      )
     vs.                                )    No. C 07-CV-3335 JSW
 7                                      )
     TAXI COMMISSION, CITY AND          )
 8   COUNTY OF SAN FRANCISCO,           )
     Executive Director Heidi Machen;   )
 9   CITY AND COUNTY OF SAN FRANCISCO,  )
     a California public entity,        )
10                                      )
             Defendants.                )
11   _____)
```

```
12

13

14

15                   DEPOSITION OF

16                   TAMARA ODISHO

17          Thursday, January 31, 2008

18

19

20   REPORTED BY:  TINA MARIE VELASQUEZ
                    C.S.R. NO. 10072            RECEIVED
21
                                                FEB 14 2008
22
                                                BY:
23          BONNIE L. WAGNER & ASSOCIATES
              COURT REPORTING SERVICES
24                41 SUTTER STREET
            SAN FRANCISCO, CALIFORNIA  94104
25                 (415) 982-4849
```

1              MR. MYLES:  That would be a permanent disability.

2              MS. GESSNER:  Q.  Just one more question.

3     Looking at Exhibit 24, are the first two bullet points,

4     the 120-day maximum leave per year and then the full-year

5     exemption once per five years for treatment of a

6     catastrophic, recoverable illness, are those the only two

7     types of accommodations that the commission offers for the

8     driving requirement?

9         A.    Under ADA, yes.

10        Q.    And there are no other types that the commission

11    currently offers?

12        A.    There is a separate accommodation, but not under

13    ADA, and that's for a 90-day leave, a request for a 90-day

14    leave that some applicants may have applied for.

15        Q.    But as of today, if someone submits a request for

16    an ADA accommodation of the driving requirement, these are

17    the only two types of accommodations that you may offer?

18        A.    Yes.

19        Q.    And if the type of accommodation they're asking

20    for does not fall within one of these two, there's no

21    accommodation you can offer them?

22             MR. MYLES:  Objection; leading.

23             MS. GESSNER:  I'll rephrase.

24        Q.    If the accommodation they're requesting does not

25    fall within one of these two, what will you do?

1    driving a taxi gave him headaches.

2        Q.   And what was the result of going to the

3    Department of Public Health?

4            MS. GESSNER:  Objection; beyond the scope of

5    30(b)(6).

6            THE WITNESS:  I don't remember specifically, but

7    I do believe it was -- there was no accommodation that

8    could be granted.

9            MR. MYLES:  Q.  And was that the recommendation

10   that you made to the executive director?

11       A.   Yes.

12       Q.   And do you know if the executive director made

13   that decision?

14       A.   I believe she did.

15       Q.   And you referred to a 90-day leave period?

16       A.   Yes.

17       Q.   But as the ADA coordinator, it's your opinion

18   that 90-day leave period does not apply to ADA requests; is

19   that correct?

20           MS. GESSNER:  Objection; calls for a legal

21   conclusion, beyond the scope of the 30(b)(6) notice.

22           MR. MYLES:  Q.  I believe you said that the

23   90-day leave period is a separate accommodation not under

24   ADA, right?

25       A.   Yes.  It's under the MPC, Municipal Police Code.

# Exhibit B

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4   WILLIAM SLOAN AND MICHAEL         )
    MERRITHEW,                        )
5                                     )          COPY
            Plaintiffs,               )
6                                     )
    vs.                               )   No. C 07-CV-3335 JSW
7                                     )
    TAXI COMMISSION, CITY AND         )
8   COUNTY OF SAN FRANCISCO,          )
    Executive Director Heidi Machen;  )
9   CITY AND COUNTY OF SAN FRANCISCO, )
    a California public entity,       )
10                                    )
            Defendants.               )
11  _____)

12

13

14

15            DEPOSITION OF

16         **ROBERT PAUL GILLESPIE**

17        Tuesday, January 15, 2008

18

19

20  REPORTED BY:  TINA MARIE VELASQUEZ
                  C.S.R. NO. 10072

                                    RECEIVED
21
                                    FEB 0 1 2008
22
                                    BY:_____
23        BONNIE L. WAGNER & ASSOCIATES
           COURT REPORTING SERVICES
24            41 SUTTER STREET
        SAN FRANCISCO, CALIFORNIA  94104
25            (415) 982-4849

1    a liberalization of the policy that was currently in place

2    that was a strict 90-day only relief from the driving

3    requirement to give people who had catastrophic,

4    recoverable illnesses some chance to recover and come back

5    to full-time driving.  And the 120 days, as I understand

6    it, was simply an extension of the 90 days.

7         Q.    Okay.  Where was the strict 90-day-only relief

8    from the driving requirement policy?  Where was that

9    stated?  In what written document was that stated?

10        A.    Well, my understanding, that's in Proposition K,

11   that language, 90 day -- I'm sure you probably know where

12   this is.  I could search for it.  Section IV.

13        Q.    Now, Section IV doesn't use the phrase "full-time

14   driving" or the phrase "continuous driving," right?

15        A.    No.  That's the section entitled "continuous

16   operation."

17        Q.    So that allows a taxi medallion holder to suspend

18   operation up to 90 days in a 12-month period?

19        A.    I can't tell you what was intended by the

20   drafters of this resolution.

21        Q.    The drafters of Resolution 2002 --

22        A.    No.  Proposition K itself.  The system currently

23   in San Francisco is that people lease out their cabs when

24   they're not driving it.

25        Q.    So operation encompasses more than just driving?

1    A.    Yes.

2    Q.    It would involve leasing?

3    A.    It does, yes.

4    Q.    Involves, say, for example, getting insurance for

5  the vehicle?

6    A.    Yes.  Well, it's not always the permit holder who

7  does that work.

8    Q.    But the permit holder's ultimately responsible

9  for it?

10    A.    No.  In our rules and regulations, the color

11  schemes have a lot of responsibility that permit holders

12  are not -- certain requirements or color scheme

13  requirements, reporting and these type of things.

14    Q.    So then I need to go back and ask the question

15  again.  Where is the strict 90-day-only relief from the

16  driving requirement?  Where is that policy written down?

17    A.    Well, again, in Section 4, it refers to "may on

18  written application to the holder of any permit hereunder

19  permission to suspend operation pursuant to such permit for

20  a period not to exceed 90 calendar days in any one 12-month

21  period in case of sickness, death or similar hardship."

22    Q.    That's operation.  But what I'm looking for is

23  the strict 90-day-only relief from the driving requirement,

24  not from the operation requirement.  From the driving

25  requirement.  Where is that policy?

1  it is.

2       MR. MYLES:  Q.  And that's why I don't

3  understand.  What does this mean?  What is this policy

4  that you've adopted?

5       A.  And that's what I just explained to you.

6       Q.  And I didn't understand it.  So the driving

7  requirement is 75 percent of the business days, 156 shifts

8  or 800 hours?  Those are all equivalent?

9       A.  Yes.

10       Q.  Let's take a for-example.  For example, I'm

11  granted a 120-day maximum leave.  How does that relate to

12  my 800 hours?

13       A.  As I understand the way the staff has implemented

14  this --

15       Q.  Not the way staff implemented it, but the way the

16  policy works.

17       MR. CHHABRIA:  What's the difference between

18  those two things, the way the staff has implemented and the

19  way the policy works?

20       MR. MYLES:  He testified that he doesn't know how

21  staff has implemented this.

22       Q.  So I'm wondering, when you adopted this policy,

23  how did you see this policy to work?

24       A.  That it was a reduction in the driving

25  requirement, but not an elimination based on a limited --

1  some limited accommodation.

2      Q.   And what is that limited accommodation?

3      A.   That's what's been adopted by this.  It's

4  essentially a third or -- again, I don't know how the

5  mathematics was done.  I don't know how it was actually

6  implemented by our staff.

7      Q.   Prior to adopting the policy, were you explained

8  how the mathematics would be done?  Were you told how the

9  mathematics would be done?

10     A.   No.

11     Q.   Do you know if a medallion holder applied for a

12  120-day maximum leave per year from his 800-hour

13  requirement -- logically, you could subtract 2,880 hours

14  from 800 hours and he wouldn't have to work that year,

15  correct?  120 24-hour days?

16     A.   I don't know -- I don't understand the logic of

17  that.  Again, it's never been the City's policy to

18  eliminate the driving requirement.  It's always been the

19  City's policy, whether it was in the management exemption

20  or anything else, was to maintain the driving requirement,

21  which was embedded in Prop K.  This is a liberalization of

22  the policy to allow people who were sick, but were going to

23  recover, to be able to come back to their medallion without

24  losing it because of a catastrophic, recoverable illness.

25  Or it's actually in the 120-day.  Again, it's an expansion

Exhibit C

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4   WILLIAM SLOAN AND MICHAEL          )
    MERRITHEW,                         )
5                                      )        COPY
           Plaintiffs,                 )
6                                      )
    vs.                                )   No. C 07-CV-3335 JSW
7                                      )
    TAXI COMMISSION, CITY AND          )
8   COUNTY OF SAN FRANCISCO,           )
    Executive Director Heidi Machen;   )
9   CITY AND COUNTY OF SAN FRANCISCO,  )
    a California public entity,        )
10                                     )
           Defendants.                 )
11  _____)

12

13

14

15             DEPOSITION OF

16           **NAOMI MARIA KELLY**

17        Thursday, January 24, 2008

18

19

20  REPORTED BY:  TINA MARIE VELASQUEZ        RECEIVED
                  C.S.R. NO. 10072
21                                           FEB 0 1 2008

22                                           BY:

23          BONNIE L. WAGNER & ASSOCIATES
              COURT REPORTING SERVICES
24               41 SUTTER STREET
          SAN FRANCISCO, CALIFORNIA  94104
25               (415) 982-4849

1  the driving requirement of Prop K?

2      A.   I'm sorry.  Define "liberalization."

3          MR. CHHABRIA:  I'll just object to that question

4  on the grounds that it misstates the prior testimony.

5          MR. BREALL:  Q.  What I understood you to say

6  was that the driving -- that resolution 2002-3 was an

7  attempt to give the commission more leeway in interpreting

8  the driving requirement and dealing with the driving

9  requirement, as opposed to the formulaic dictates of

10 Prop K?

11     A.   No.  This resolution specifically dealt with the

12 essential eligibility requirement of the City's taxi

13 permitting programs.

14     Q.   I understand that in terms of a continuous

15 driving as an essential eligibility requirement.  I thought

16 what you told me was that, at least for a portion of this,

17 it was meant to adopt the reasoning and rationale from

18 Exhibit 16, the court of appeal decision, which indicated

19 that there could be more leeway in defining continuous

20 driving for a permit holder.

21         MR. CHHABRIA:  Object, to the extent it calls for

22 a legal conclusion.

23         MR. BREALL:  Q.  You can answer.

24     A.   It was specific -- we separated the issues.  And

25 this resolution specifically was dealing with the

1  continuous driving requirement to the extent it was an

2  essential eligibility requirement.

3      Q.  Okay.  So, in essence, what you're saying to me

4  is, your understanding of this is this was simply just sort

5  of a reaffirmation of Prop K?

6      A.  No.  It was to determine again the essential

7  eligibility requirement and consider the continuous driving

8  requirement as an essential eligibility requirement and

9  give more direction to the staff on what would be a

10 reasonable accommodation.

11     Q.  How did it give you more direction as to what

12 would be a reasonable accommodation?

13     A.  Well, it says specifically "Whereas, the

14 California Court of Appeals has stated that the City, in

15 defining continuous driving need not strictly adhere to the

16 specific quantitative formulas of Prop K for measuring

17 full-time driving, but may make some limited allowance for

18 disabled permit holders by employing alternative

19 definitions, provided that the alternative definitions

20 comply with Proposition K's mandate that permit holders

21 drive on a continuous basis."

22     Q.  Was there any discussion when this was up for

23 adoption as to whether or not that statement was actually

24 in the court of appeal decision?

25     A.  I don't recall.

1      Q.    Did you have a deputy city attorney that was

2  specifically assigned to your commission?

3      A.    Yes.

4      Q.    Who was that?

5      A.    In 2001?

6      Q.    Yeah.

7      A.    Paul Zarefsky.

8      Q.    Did it change during your tenure?

9      A.    Yes.

10     Q.    And how many times did it change?

11     A.    Once.

12     Q.    Who did it change from Mr. Zarefsky to?

13     A.    Tom Owen.

14     Q.    When was the first time that you were aware of

15  that the commission adopted an ADA policy?

16     A.    The commission first started addressing ADA in

17  February 2002.

18     Q.    How did they first start addressing ADA in

19  February 2002?

20     A.    Well, again, we had a backlog of requests coming

21  in, so we needed procedures on how to process these

22  requests.  So I believe they passed procedures and

23  guidelines or adopted procedures and guidelines.

24            MR. BREALL:  Why don't we mark this next in

25  order.

1  long-term disabled medallion holders, correct?

2       A.   To the extent -- I was trying my hardest.

3       Q.   And you were, at least initially, discussing a

4  plan where there would be extended periods of waiver,

5  renewable or -- periods of waiver that would be renewed on

6  an annual basis?

7       A.   Yes, I was trying to set up a policy -- a

8  program, not a policy, that you could renew your request,

9  but it would be reviewed on a yearly basis; but again, I

10 was always cognizant that I couldn't keep renewing forever.

11      Q.   And, in fact, if you turn to page seven and eight

12 of the Rivera transcript, you actually informed the Board

13 of Appeals that the commission was formulating -- was

14 attempting at that time to formulate such a policy,

15 correct?

16      A.   I have to review.

17      Q.   Sure.  I'd like you to review page 7, lines 24

18 through 25; and 8, 1 through 6.  Actually, one through --

19 yeah, one through six.

20      A.   Yes, I was working on a program.

21      Q.   And one of the reasons that you were working on a

22 program and -- strike that.

23           Was one of the reasons you were working on this

24 program and felt that there could be a program was because

25 with the advent of medical science and technology, there

1    front of me --

2         Q.    Sure.   I'd like to do that.   Give me a minute.

3    Actually, we've been going about an hour, so why don't you

4    give me a minute, if you want to take a break to use the

5    rest room or something.   I just got to set this up.

6              THE WITNESS:   Sure.

7              (Recess from 12:12 p.m. to 12:24 p.m.)

8              MR. BREALL:   Back on the record.

9         Q.    I am now going to show you, Ms. Kelly, or attempt

10   to show you part of a Taxi Commission hearing from

11   September 23rd -- strike that.   Before we do that -- we're

12   going to do that in a minute.   Before we do that, let's

13   mark this as next in order.

14             (Document, more particularly described in the

15             index, marked for identification as

16             Plaintiffs' Exhibit No. 20.)

17             MR. BREALL:   Q.   Let me know when you've had a

18   chance to review this Exhibit 20, which is a memorandum

19   that says it's from you to Supervisor Jake McGoldrick,

20   dated July 30, 2003.

21        A.    I'm done.

22        Q.    Do you remember authoring this memorandum?

23        A.    Yes.

24        Q.    And this memorandum does discuss the permanent

25   disability program we have been talking about earlier,

1 correct?

2   A. It discusses a long-term disability program.

3   Q. Okay.  That you were developing?

4   A. Correct.

5   Q. And you sent this to Supervisor McGoldrick,

6 correct?

7   A. Correct.

8   Q. Why did you send this to Supervisor McGoldrick?

9   A. Supervisor McGoldrick was inquiring about what

10 the taxi commissioners were doing for disabled permit

11 holders, because he was very friendly with the permit

12 holders and drivers' association.

13   Q. Did he require this of you -- did he inquire of

14 you specifically or did he inquire of the commission?

15   A. He inquired of me specifically.

16   Q. Did you report to the commission his inquiry?

17   A. I don't recall.

18   Q. Do you recall discussing with any commissioner

19 the fact that McGoldrick was wanting to know what was going

20 on regarding the plan for long-term disabled permit

21 holders?

22   A. I don't recall.

23   Q. Do you recall discussing your response to

24 Supervisor McGoldrick with any of the commissioners prior

25 to issuing it?

1                   deposition.)

2          MS. KELLY:  Hearing and discussion of Taxi

3   Commission's partnership for the Department of Public

4   Health in regards to procedures for processing requests

5   under the Americans with Disability Act for modification of

6   a taxi permit requirement.

7               Director of Health, Mitch Katz, is here tonight.

8   But before I move there, I just want to quickly go over

9   what the Taxi Commission and our partnership -- what I've

10  been working with the Department of Public Health on in

11  regards to the Americans with Disabilities Act and the

12  type of request that we receive from taxi permit holders

13  and the different type of modifications that we are

14  looking at in the taxi industry.

15              As you know, I'm in the process of establishing

16  guidelines and processing these requests under the

17  Americans with Disability Act.  As part of implementing

18  the Taxi Commission's disability program, I'm working with

19  the Department of Public Health.  And Dr. Mitch Katz is

20  here tonight to speak to you.  He's assisting in the

21  design of the program.  And in addition, healthcare

22  professionals from the Department of Public Health will

23  also assist the taxi commissioner and the ADA coordinator

24  that will be in our office in reviewing requests for

25  accommodations under the ADA for permit holders.

1    Proposition K already allows the Taxi Commission

2  to waive the driving requirement for permit holders who

3  are partially or temporary disabled.  However, for permit

4  holders who are permanently disabled, the Taxi Commission

5  is working with the Department of Public Health, and

6  they're developing an ADA accommodation program that is

7  somewhat similar to the City's catastrophic illness

8  program for City employees in how it handles long-term or

9  ongoing conditions.

10    Before Dr. Katz comes up here and talks more

11  about DPH's role with the Taxi Commission and the medical

12  side of occupational injuries associated with taxicab

13  driving, I just wanted to quickly review the Taxi

14  Commission's ADA procedures.  And just to let you know,

15  this is still a work in process because this is all new to

16  me and to our staff and to the Taxi Commission.

17    As you know, a permit holder can either orally

18  call or send in a written request.  The coordinator

19  reviews procedures with the permit holder and distributes

20  forms, including a medical authorization release form.

21  The coordinator collects the information from the permit

22  holder's healthcare provider.  Every permit holder's

23  medical records are confidential.  However, the Taxi

24  Commission's coordinator must share this information with

25  City personnel, such as healthcare professionals at DPH,

1   ADA specialists or the City Attorney's Office, as needed,

2   to evaluate the ADA's request.

3           All correspondence, notes, conversations,

4   physician reports and any additional information

5   pertaining to the permit holder's specific medical

6   condition will be handled and filed in a manner that will

7   protect the permit holder's confidentiality.  The

8   coordinator will evaluate and request the requested

9   modification.  The Taxi Commission's ADA coordinator will

10  be trained by healthcare professionals at the Department

11  of Public Health.  In addition, the commission will

12  discuss with DPH -- will consult with DPH when necessary

13  in evaluating the different modifications.

14          The new coordinator will make a recommendation

15  to the executive director whether the permit holder's ADA

16  request should be granted or denied, and the executive

17  director will make a decision and then present it to the

18  Taxi Commission.

19          Appeals:  If the permit holder's ADA request is

20  denied, the decision will state the reasons for denial.

21  If the request is denied because the permit holder is not

22  disabled within the meaning of the ADA, then that decision

23  will be appealed both to the Health Commission.  If the

24  request is denied solely because the permit holder, even

25  if disabled, would not be considered under the ADA to be a

1    qualified individual with a disability, that permit holder

2    may appeal that issue to the Taxi Commission within 30

3    days of the decision.  The appeal must be in writing and

4    sent to the executive director, and the commission shall

5    decide the appeal within 45 days.

6         And from there -- that's just kind of a brief --

7    these procedures are on the Internet.  There's some

8    changes we want to have -- one change -- these are

9    guidelines, which, you know, they're working procedures so

10   I have a bit of a discretion to change some of it.  The

11   one thing that I did change --

12        MR. CHHABRIA:  Can you stop that?

13        MR. BREALL:  Yes.

14        MR. CHHABRIA:  I thought you were going to turn

15   it off, and I just wanted to request her entire statement

16   be played for the record.

17        MR. BREALL:  I have no problem.  Her entire

18   statement is almost done.

19        MR. CHHABRIA:  Okay.

20        MR. BREALL:  I was actually -- just so the record

21   is clear, I am going to have this transcribed into a

22   booklet, both with her statement and Mitchell Katz's

23   statement and questions from the panel, which I'm happy to

24   provide you a copy of -- or the court reporter will be

25   happy to provide you a copy with.

# *MEMORANDUM*

**MEMO TO:**   **SUPERVISOR JAKE MCGOLDRICK**

**FROM:**       **NAOMI LITTLE**
              **EXECUTIVE DIRECTOR**

**DATE:**        **JULY 30, 2003**

**SUBJECT:**    **TAXI COMMISSION'S DISABILITY PROGRAM**

On February 26, 2002, the Taxi Commission passed Resolution 2002-14, authorizing the Executive Director to establish guidelines and process requests under the Americans with Disabilities Act.  As part of implementing the Taxi Commission's disability program, the Commission is working with the Department of Public Health ("DPH").  Dr. Mitch Katz, Director of Health, is assisting in the design of the program. In addition, health care professionals from the DPH will assist in reviewing requests for accommodations under the Americans with Disability Act by taxi permit holders.

Proposition K already allows the Taxi Commission to waive the driving requirement for a permit holder who becomes partially or temporarily disabled. However, for permit holders who are permanently disabled, the Taxi Commission and DPH are developing an ADA accommodation program that is somewhat similar to the City's catastrophic illness program for City employees in how it handles long-term or ongoing conditions.  A disabled permit holder may apply for a waiver or reduction of the driving requirement, and the waiver or reduction, in appropriate cases, may be renewed on a yearly basis.



Δ⟨π EXHIBIT 20
Deponent Kelly
Date 1/24/08 Rptr. IV
WWW.DEPOBOOK.COM

1  holders could be put in place?

2      A.   Yes.

3           MR. CHHABRIA:   Leading.

4           MR. BREALL:   This is an adverse witness.   You

5  produced them.   This is a witness for the City.

6      Q.   Go ahead.

7      A.   And that's why -- for that exact reason, why I

8  knew I could not renew on a yearly basis, in the hopes

9  that -- it was one of the reasons that I felt a little bit

10 comfortable in saying, okay, I cannot renew on a yearly --

11 or imperpetuity, but I can renew on a yearly basis, because

12 if you're blind, you may be able to get transplants and you

13 can see again and drive, but it could not be for

14 imperpetuity.

15     Q.   No, I understand that.

16          And, in fact, if you lost a leg, you may be able

17 to get a prosthesis and drive?

18     A.   Correct.

19     Q.   And when I asked you -- okay.   If you can turn to

20 page 33, line 16 through 24.

21     A.   Yes.

22     Q.   That statement that starts, "In regards to

23 disability, and what we're doing for permit holders, the

24 commission did set up guidelines this past year to help

25 those who are temporarily disabled, and we're currently

1       Q.   And maybe we're talking across purposes, but I

2   mean, I could attempt to build the Eiffel Tower out of

3   toothpicks, but I probably wouldn't be able to --

4       A.   Let me just clarify for you.  It was never fully

5   implemented by the time I left the Taxi Commission.

6       Q.   We'll talk about implementation in a minute.  But

7   you were --

8       A.   Approved or -- there was a lot more steps we

9   needed to take and resolutions that needed to go before the

10  Taxi Commission that did not occur while I was there.

11      Q.   I understand.  But you were successful in

12  designing such a program; meaning, you crafted something?

13      A.   We came up with an idea that was hopefully --

14  that we were trying to implement.

15      Q.   Okay.  And in fact, you informed the commission

16  of that, correct?

17      A.   Yes, I did.

18      Q.   As a matter of fact, I'm going to show you now a

19  portion of the commission meeting of September 23rd, '03,

20  where you specifically inform the commission of the program

21  that you're designing.  I just want to make sure that this

22  is you doing that.

23          MR. CHHABRIA:  So the reporter is going to take

24  this down?

25          (The following DVD was played at the